Connor L. Cantrell, Esq., clc@thlf.com, Utah Bar No. 15319
Attorney for Zurich American Insurance Company and
Fidelity and Deposit Company of Maryland
The Hustead Law Firm, A Professional Corporation
4643 S. Ulster Street, Suite 1250
Denver, CO 80237
303-721-5000

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

---

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND, | Civil Action No.: |
| | **COMPLAINT** |
| **Plaintiff,** | |
| v. | |
| ASCENT CONSTRUCTION, INC., BRAD L. KNOWLTON, SHONDELL SWENSON (F/K/A SHONDELL KNOWLTON), J. SCOTT JOHANSEN, AND MARLAINE JOHANSEN, | |
| **Defendants.** | |

---

Plaintiff, Zurich American Insurance Company and Fidelity and Deposit Company of Maryland (collectively, "Plaintiff," "Zurich," or "Surety"), submits its Complaint against Defendants Ascent Construction, Inc. ("Ascent"), Brad L. Knowlton, Shondell Swenson (f/k/a Shondell Knowlton), J. Scott Johansen, and Marlaine Johansen (collectively, the "Individual Indemnitors") (Ascent and the Individual Indemnitors are referred to collectively as "Defendants").

## I.    **PARTIES**

1.      Zurich is a company organized and incorporated under the laws of the State of Maryland, with its principal place of business located at 1299 Zurich Way ZAIC, Schaumburg, IL 60196.

2.      Ascent is a Utah corporation and Indemnitor of Zurich that, at all times alleged herein, conducted business in the State of Utah with its principal place of business located at 310 W. Park Lane, Farmington, UT 84025.

3.      Brad L. Knowlton is an Individual Indemnitor of Zurich, who has expressed an intent to remain in Utah indefinitely, and whose last known residence address is 478 Island View Circle, Farmington, UT 84025.  Mr. Knowlton is Ascent's president and holds an ownership interest in Ascent.

4.      Shondell Swenson f/k/a Shondell Knowlton is an Individual Indemnitor of Zurich, who has expressed an intent to remain in Utah indefinitely, and whose last known residence is 1493 Mirabella Way, Fruit Heights, UT 84037.  Shondell Swenson is the ex-wife of Brad Knowlton, and holds an ownership interest in Ascent, received as a marital asset in her ongoing divorce proceeding with Brad Knowlton.

5.      J. Scott Johansen is an Individual Indemnitor of Zurich, who has expressed an intent to remain in Utah indefinitely, and whose last known residence is 498 N. Henry Street, Kaysville, UT 84037.  J. Scott Johansen is the former chief financial officer of Ascent, and upon information and belief, still holds an ownership interest in Ascent.

6.      Marlaine Johansen is an Individual Indemnitor of Zurich, who has expressed an intent to remain in Utah indefinitely, and whose last known residence is 498 N. Henry Street,

Kaysville, UT 84037.  Ms. Johansen is the wife of J. Scott Johansen, and upon information and belief, holds an ownership interest in Ascent through marital right.

## II.    JURISDICTION/VENUE

7.    Zurich hereby incorporates by reference all the allegations contained above as though set forth herein.

8.    This Court has personal jurisdiction over the Defendants because Ascent transacted business in and around Salt Lake City, Utah, including, but not limited to, performing construction work in and around Salt Lake City, Utah and entering into contracts with Zurich in which Defendants promised to post collateral with Zurich as set forth in the contracts and to reimburse Zurich for, among other things, any losses, expenses, payments, attorneys' fees, costs incurred by Zurich in the event Zurich incurs losses as a result of issuing construction surety bonds on behalf of Ascent.  As such, Ascent and the Individual Indemnitors – all Defendants – purposefully availed themselves of the benefits and privileges of conducting business in Utah.

9.    This Court has original subject matter jurisdiction over Zurich's claims pursuant to 28 U.S.C. § 1332 (diversity) because the amount of Zurich's claims against Defendants exceed $75,000 (Zurich seeks collateral in the amount of no less than $10,000,000), and Zurich is a citizen of a different state than each of Ascent and the Individual Indemnitors.

10.    As set forth above, Zurich is a citizen of Maryland, where Zurich is incorporated, and Illinois, where Zurich's principal place of business is located.  As set forth above, Ascent is a citizen of Utah, where Ascent is incorporated and where its principal place of business is, while the Individual Indemnitors are each domiciled in Utah and therefore citizens of Utah.

11.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Zurich's claim occurred in or around Salt Lake City, Utah.

## III.    GENERAL ALLEGATIONS

12.    Zurich hereby incorporates by reference all the allegations contained above as though set forth herein.

### A.    The Bonds

13.    Zurich, as Surety, has issued construction payment and performance bonds ("Bonds") on behalf of Ascent, as principal, for at least the following construction projects ("Projects"), including but not limited to:

| Obligee | Project | Bond Amount |
| --- | --- | --- |
| Sugarmont, LLC | Sugarmont Apartments (Bond No. 9254707) | $62,750,000 |
| Northern Utah Healthcare Corporation | HCA St. Mark's Hospital – West Valley Free Standing Emergency Room (Bond No. 9283934) | $5,135,674 |
| Salt Lake County | Salt Lake County's Outdoor Education Center at Wheeler Farm (Bond No. 9300530) | $2,630,000 |
| City of Bountiful | Bountiful City Hall Remodel (Bond No. 9323929) | $7,184,110 |
| The Station at Gardner Mill | Station at Gardner Mill (Bond No. 9259518) | $38,242,184 |
| City of South Jordan | City of South Jordan Fire Station 64 (Bond No. 9308979) | $11,200,000 |
| Crescent Senior Living, LLC | Crescent Heights Senior Living Center (Bond No. 9211010) | $13,842,762 |
| Elko County School District | Elko County School District Spring Creek ES No. 3 (Bond 9281230) | $23,858,340 |
| Utah Charter Academies, Inc. | Utah Charter Academy D3HS APA Auditorium (Bond No. 9288360) | $10,000,000 |
| Utah Charter Academies, Inc. | Utah Charter Academy WVC2 Classroom (Bond No. 9288361) | $4,920,000 |
| Davis School District Board of Education | West Bountiful Elementary (Bond No. 9288382) | $21,637,947 |

4

| | | |
|---|---|---|
| State of Utah – Division of Facilities Construction & Management | Salt Lake Community College Construction Trades Renovation (Bond No. 9314349) | $1,628,000 |
| State of Utah – Division of Facilities Construction & Management | New Herriman Liquor Store (Bond No. 9300465) | $2,958,300 |
| City of Layton | Layton City Kenley Amphitheatre (Bond No. 9300506) | $1,442,336 |
| Early Light Academy | Early Light Academy - Addition to Building A (Bond No. 9309019) | $1,492,000 |
| Bodhi Salt Lake City, LP | Bodhi Apartments (Bond Nos. 9229502 and 9254717) | $11,427,566 |
| State of Utah – Division of Facilities Construction & Management | New Central Regional Office for Division of Wildlife Resources (Bond. No. 9283855) | $1,900,000 |
| Davis School District Board of Education | Freeport Building G5 Freezer Addition (Bond No. 9294628) | $3,038,000 |
| Jordanelle Special Service District | Jordanelle District Administration Building (Bond No. 9300494) | $913,000 |
| DRN Holdings | Deep Harvest Dispensary (Nevada State Contractor's Bond No. 08420013) | $30,000 |
| Sandy City | Sandy City Public Works Building (Bond No. 9268679) | $5,000,000 |

14.    Pursuant to the terms of the Bonds and prevailing law, Zurich guaranteed that if Ascent failed to take certain actions, the underlying bonded obligation would become due, and Zurich would pay the debt.  The penal sums of the Bonds exceed TWO HUNDRED MILLION DOLLARS ($200,000,000.00).

15.    Zurich is exposed to tens of millions of dollars in liability as a result of issuing the Bonds.

**B.**    **The Indemnity Agreements**

16.    As consideration for Zurich issuing the Bonds and other consideration, on or about July 10, 2001, Ascent and the Individual Indemnitors executed an Agreement of Indemnity (hereinafter referred to as "2001 GIA") in favor of Zurich.[1]  A copy of the 2001 GIA is attached as **Exhibit 1** and incorporated herein by reference.

17.    The 2001 GIA provides, in pertinent parts (emphasis added):

**INDEMNITY**

SECOND:   The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interests, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.

**ASSIGNMENT**

THIRD: The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter, incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds; or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors, or of tl1e appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material  referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor  be an individual: (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the

---

[1]   The Individual Indemnitors also executed the 2001 GIA but were subsequently released from the 2001 GIA in 2010.

<u>Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.</u>

18.     Or about May 17, 2017, in consideration for, among other consideration, Zurich issuing the payment and performance bonds for the Sugarmont Apartments project – a $62,750,000 contract (Ascent's largest construction contract), Ascent and the Individual Indemnitors executed a new GIA in favor of Zurich (the "2017 Sugarmont GIA"). The 2017 Sugarmont GIA did not replace, relieve, or otherwise satisfy the Defendants' obligations under the 2001 GIA or any other GIA.

19.     Also, on or about May 17, 2017, in consideration for, among other consideration, Zurich issuing the payment and performance bonds for the Station at Gardner Mill project - a $38,242,184 contract (Ascent's second largest construction contract) Ascent and the Individual Indemnitors executed another GIA in favor of Zurich (the "2017 Gardner Mill GIA"). The 2017 Gardner Mill GIA did not replace, relieve, or otherwise satisfy the Defendants' obligations under the 2001 GIA, the 2017 Sugarmont GIA, or any other GIA.

20.    A copy of the 2017 Sugarmont GIA is attached as **Exhibit 2**; a copy of the 2017 Gardner Mill GIA is attached as **Exhibit 3**; and both are incorporated herein by reference (together, the "2017 GIAs").

21.    The 2017 GIAs provide, in pertinent parts (emphasis added):

**2. INDEMNITY:** Indemnitors shall exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with this Agreement, (d) Surety enforcing this Agreement or (e) any act of Surety to protect or procure any of Surety's rights, protect or preserve any of Surety's interests, or to avoid, or lessen Surety's liability or alleged liability. The liability of Indemnitors to Surety under this Agreement includes all Claims made on Surety, all payments made, Loss incurred, and all actions taken by Surety under the Good Faith belief that Surety is, would be or was liable for the amounts paid or the actions taken, or that it was necessary or expedient to make such payments or take such actions, whether or not such liability, necessity or expediency existed. Indemnitors shall promptly, upon demand, make payment to Surety as soon as liability or Loss exists, whether or not Surety has made any payment. An itemized statement of Loss, sworn to by any officer of Surety, or the voucher or other evidence of any payment, shall be *prima facie* evidence of the fact, amount and extent of the liability of Indemnitors for such Loss. Indemnitors shall promptly, upon demand, procure the full and complete discharge of Surety from all Bonds and all liability in connection with such Bonds. If Indemnitors are unable to obtain discharge of any or all such Bonds within the time demanded, Indemnitors shall promptly deposit with Surety an amount of money that Surety determines is sufficient to collateralize or pay any outstanding bonded obligations.

**4. PLACE IN FUNDS:** Indemnitors agree to promptly deposit with Surety, on demand, an amount of money that Surety determines is sufficient to fund any liability or Loss. Such funds may be used by Surety to pay Loss or may be held by Surety as collateral against potential future Loss. Any remaining funds held by Surety after payment of all sums due to Surety under this Agreement shall be returned upon the complete release and/or discharge of Surety's liability under all Bonds.

**5. PLEDGE AND ASSIGNMENT OF COLLATERAL:** Indemnitors pledge, assign, transfer and set over to Surety the Collateral[2], as collateral to secure the obligations in this

---

[2]  "Collateral" is defined in the GIAs as "all right, title and interest of one or more Indemnitors in the following, wherever located, and whenever acquired or arising: (a) all Bonded Contracts; (b) all goods (including equipment, machinery, tools and materials), general intangibles, and inventory, to the extent not subject to a prior perfected security interest; (c) all subcontracts and purchase orders arising under any Bonded Contract, and all surety bonds supporting such subcontracts and purchase orders; (d) all sums which are or may become payable in connection with

Agreement, whether incurred before or after the execution of this Agreement, including a license to use the Collateral, without cost, to perform or discharge Surety's obligations under any Bond or Bonded Contract. This pledge and assignment becomes effective on the date of this Agreement, or the earliest date allowable by law.

**15.  SURETY'S ADDITIONAL RIGHTS**: This Agreement is in addition to and not in lieu of all other agreements of indemnity and any and all rights, powers, and remedies that Surety may have or acquire against Indemnitors or any other person or entity, whether by agreement, law or otherwise. Indemnitors acknowledge and agree that other indemnity, collateral, property and/or security may be required by Surety with respect to Bonds issued under this Agreement. Indemnitors shall remain bound under the terms of this Agreement even though Surety may from time to time (before  or after the date of this Agreement): (a) accept, modify or release other agreements of indemnity with respect to any Bond; (b) accept, modify the indemnity of, or release any Indemnitor or any other person or entity; or (c) accept, release or subordinate any rights to collateral, real property, personal property or security.  Indemnitors' obligations to Surety shall not be waived or reduced by any claim, setoff, defense, or other right or cause of action which Indemnitors and/or Surety may hold against any person or entity or which may be asserted by any Principal, Indemnitor or any other person or entity arising from or related to any Bonded Contract, any Bond, this Agreement, other agreements, by law or otherwise. Surety is subrogated to all rights, Claims, funds and receivables related to any Bonded Contract. Surety has the right to offset Loss on any Bonded Contract against proceeds, funds, real property or personal property under any other Bonded Contract or otherwise available to Surety under this Agreement. Surety's forbearance or failure to act to enforce any right shall not waive or diminish any of its rights, which rights may be enforced at any time in Surety's sole discretion.

**16. SURETY'S RIGHT TO SPECIFIC PERFORMANCE**: Indemnitors acknowledge that the failure of Indemnitors, collectively or individually, to perform or comply with any provision of this Agreement shall cause irreparable harm to Surety for which Surety has no adequate remedy at law. Indemnitors agree that Surety shall be entitled to injunctive relief and/or specific performance, and Indemnitors waive any claims or defenses to the contrary.

22.     Pursuant to the 2001 GIA and 2017 GIAs, Ascent and the Individual Indemnitors

agreed, among other things, to exonerate, indemnify, and hold Zurich harmless from any and all

liability for losses, costs, damages, attorney's fees, and expenses of whatever kind that Zurich may

---

any Bonded Contract and all other contracts in which any Indemnitor has an interest; (e) all intellectual property (including proprietary software)  necessary  or required to perform any Bonded Contract; (f) any facilities or plants necessary or required to perform any Bonded Contract; and (g) any real or personal property, the improvement of which is secured by any Bond."

sustain or incur by reason of having executed any bonds for or at the request of Ascent.  Ascent

and the Individual Indemnitors also promised to place Zurich in funds sufficient to cover any and

all actual and potential liability that Zurich might incur as a result of claims on any bonds.

23.     On or about July 2, 2019, as further consideration for Zurich issuing the Bonds and,

among other consideration, Zurich issuing the payment and performance bonds for the Bountiful

City Hall remodel project, Ascent and Brad L. Knowlton executed a GIA ("2019 GIA") in favor

of Zurich, utilizing essentially identical language to that contained in the 2017 GIAs.   A copy of

the 2019 GIA is attached as **Exhibit 4** and incorporated herein by reference.[3]  The 2019 GIA did

not replace, relieve, or otherwise satisfy the Defendants' obligations under the 2001 GIA, the 2017

GIAs, or any other GIA.

24.     By virtue of the definitions and representations in the referenced GIAs, Ascent and

the Individual Defendants are, *inter alia*, obligated to post collateral with Zurich, cooperate with

Zurich's investigation into claims, and are jointly and severally liable to Zurich as set forth herein.

The Defendants have these obligations at common law as well.

**C.     Zurich's Concerns About Exposure and Receipt of Claims**

25.     To date, Zurich has received and continues to receive payment and performance

bond claims on multiple projects alleging that Ascent failed to properly pay for labor and materials

or otherwise perform its obligations as a general contractor.  The claims currently total more than

---

[3]  Brad Knowlton apparently handwrote "for the Bountiful Courts project" as an unapproved alteration to the July 2, 2019 general indemnity agreement.  The Surety's underwriting team rejected this change, and Ascent and Brad Knowlton executed acknowledgments for the July 2, 2019 GIA in the original intended format, which is attached as **Exhibit 4**.  The July 2, 2019 GIA did not replace, relieve, or otherwise satisfy other indemnitors' obligations under other applicable GIAs, which remain fully in place and enforceable by Zurich.

$58,000,000.00 and are increasing on a near daily basis.  The following is just a sampling of claims

received by the Surety:

      a.  Sugarmont submitted a performance bond claim to Zurich and initiated litigation against Ascent alleging damages "currently in excess of $38,000,000, but which increase every day, and which will be substantially greater if Ascent's breaches lead to the loss of the Sugarmont Project."[4]

      b.  On March 19, 2020 the City of Bountiful sent Zurich its Notice of Termination to Ascent and submitted a performance bond claim for the $7,184,110 Bountiful City Hall renovation project.  Zurich has already paid at least $1,470,716.71 in payment bond claims to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from the City of Bountiful.  Despite remaining portions of the contract balance, Zurich expects to lose at least $1,019,486.42 on this project in excess of the contract balance.

      c.  On March 10, 2020, the City of South Jordan sent Zurich its Notice of Termination of Ascent and performance bond claim for the City's $11,200,000 Fire Station 64 project.  Further, Zurich has already paid at least $2,099,542.85 in payment bond claims relating to the Fire Station 64 project.  These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from the City of South Jordan.  Despite remaining portions of the contract balance, Zurich expects to lose at least $907,461.53 on this project in excess of the contract balance.

      d.  On March 6, 2020, Utah Charter Academies, Inc. sent Ascent and Zurich a Notice of Default and performance bond claim for Ascent's alleged defaults at the D3H3 American Preparatory Academy Auditorium project, a $10,000,000 project.  Zurich has already paid $315,014.28 in payment bond claims for this project.  These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from Utah Charter Academies.

      e.  Zurich has paid at least $433,084.90 in payment bond claims relating to Utah Charter Academies, Inc.'s West Valley Classroom project.  These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from Utah Charter Academies, Inc.

---

[4] Sugarmont, LLC initiated a proceeding in Utah's Third District Court for Salt Lake County on October 16, 2019 (Case No. 190908188 - Judge Holmberg presiding), wherein Sugarmont is seeking damages and injunctive relief.  The underlying construction contract dispute was referred to arbitration on March 23, 2020, and Zurich has intervened in the proceedings.   Zurich is concerned that, should Ascent be found liable in the Sugarmont proceedings, Sugarmont may attempt to bind Zurich to a judgment against Ascent.

f.  On March 16, 2020, Zurich received a Notice of Contractor's Termination and performance bond claim from the Davis School District Board of Education for the $21,637,947 West Bountiful Elementary project. Zurich has already paid at least $4,356,017.57 in payment bond claims for this project. These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from the Davis School District Board of Education. Despite remaining portions of the contract balance, Zurich expects to lose at least $2,304,068.41 on this project in excess of the contract balance.

g.  Zurich paid $102,000 to settle litigation relating to a roofer's payment bond claim on the Elko County (Nevada) School District's Spring Creek Elementary School No. 3 project. Ascent had failed to pay the roofer – even after being directed to do so by the Nevada Board of Contractors at a March 5, 2020 meeting. Zurich has paid at least $645,956 in additional payment bond claims relating to the Elko County School District project. These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from the project owner.

h.  Zurich has paid at least $672,923.28 in payment bond claims relating to the Station at Gardner Mill ("SGM") apartment project. These amounts were paid to Ascent's subcontractors/suppliers that Ascent failed to pay after receiving contract funds from the project owner.

i.  On June 19, 2020, the owner of SGM sent a demand on the $38,242,184.00 performance bond that Zurich issued for the project by Zurich. Damages claimed by SGM are not fully known at this time.

j.  On June 25, 2020, the City of Sandy sent Zurich a notice that it was considering declaring a contractor default on the $5,000,000 Sandy City Public Works project for Ascent's alleged failure to perform.

26.  As of July 16, 2020, the total outstanding balance of funds owed to Zurich for satisfaction of payment bond claims and surety advances (after accounting for contract funds turned over by owners) is at least $14,766,252.76.

27.  Through April 30, 2020, Zurich incurred over $352,041.00 in attorneys' fees, costs, and expenses, and expects to continue incurring attorneys' fees, costs, and expenses on a near daily basis until this matter is resolved.

28.    As a result of these claims and accruing costs, Zurich is exposed to substantial losses under its Bonds, for which Ascent and the Individual Indemnitors are jointly and severally liable.

29.    In an attempt to ascertain Ascent's financial condition and status of dozens of projects (including an accounting of amounts received from project owners and amounts owed/paid to hundreds of subcontractors and suppliers), Zurich sent Ascent and Brad Knowlton a request to inspect Ascent's books and records on November 26, 2019 (the "Books and Records Request").  A copy of the Books and Records Request is attached as **Exhibit 5** and incorporated herein by reference.

30.    Ascent delayed providing Zurich with access to its books and records for two months, and when Zurich's third-party construction consultant and accountant finally gained access, Ascent's financial and project payment records were so disorganized and out-of-date, that a reconciliation was impossible and remains so.

31.    Further, Zurich's team was not provided access to Ascent's bank records until nearly a month after first making daily visits to Ascent's corporate offices.

32.    To date, Ascent has been unable account for the disposition of the project funds that it received and owes to dozens, if not hundreds, of subcontractors/suppliers.

33.    Ascent has failed or refused to provide reconciled accounts payable and receivable.

34.    Ascent has failed or refused to provide access to all of its bank statements and related financial condition.

35.     Ascent and its representatives have admitted that Ascent received funds from owners of project bonded by Zurich, but that those funds were not used to pay bonded debt – i.e. Ascent's subcontractors/suppliers.

36.     Ascent's president, Brad Knowlton, has told project owners that funds paid to Ascent had been paid to the intended recipient subcontractors/suppliers but then requested that Zurich pay these same subcontractors/suppliers.

37.     Knowlton has also told Ascent's subcontractors/suppliers that Ascent has received funds earmarked for them from project owners and that checks are ready for them to pick up, but then either not signed the checks or issued checks with insufficient funds.  Ascent has failed and refused to provide a list of these checks, despite multiple requests.

38.     Ascent has used funds intended for subcontractors/suppliers for its own purposes and to the benefit of the Individual Indemnitors, forcing subcontractors/suppliers to make claims on Zurich's bonds and/or to lien project owners' properties.

39.     As a result of all the above, and in light of Zurich's significant exposure to losses, Zurich is justifiably concerned that Ascent and/or the Defendants have misappropriated or otherwise absconded with funds that could and should be used to satisfy Zurich's bonded obligations.

**D.**     **Zurich's Demands for Indemnity and Collateral**

40.     On or about February 21, 2020 formal notice and demand was made on behalf of Zurich to Ascent and the Individual Indemnitors regarding their joint and several duties to defend and indemnify Zurich from and against all losses related to claims for Ascent Projects, including,

but not limited to, bond payments, costs, and attorneys' fees. A copy of the February 21, 2020 indemnity demand is attached as **Exhibit 6** and incorporated herein by reference.

41.     On or about March 17, 2020 another formal notice and collateral demand was made on behalf of Zurich to Ascent and the Individual Indemnitors regarding their joint and several duties to place Zurich in sufficient funds to protect Zurich from and against all liability and loss relating to Ascent Projects, including, but not limited to, bond payments, costs, and attorneys' fees. A copy of the March 17, 2020 collateral demand is attached as **Exhibit 7** and incorporated herein by reference.

42.     Yet another formal notice and collateral demand was made on behalf of Zurich to Ascent and the Individual Indemnitors on April 3, 2020, which did not result in Ascent or the Individual Indemnitors complying with their obligations set forth in the GIAs. A copy of the April 3, 2020 collateral demand is attached as **Exhibit 8** and incorporated herein by reference.

43.     Zurich has made repeated informal collateral demands via emails as Zurich has received payment and performance claims and requested information from Ascent.

44.     Zurich has not received a response to these demands from Ascent or the Individual Indemnitors indicating that they will comply with their obligations under the GIAs.

45.     The failure of Ascent and the Individual Indemnitors to respond to Zurich's collateral demands, along with other information indicating the misappropriation of project funds, has exacerbated Zurich's concerns about Ascent and the Individual Indemnitors' ability and intention to satisfy bonded obligations.

46.     Zurich is concerned that there will be a shortfall of project funds available to complete and pay for Ascent's projects as Ascent has misappropriated project funds.

47.     Unless and until the injunctive relief requested herein is granted, there is a clear and present threat that Zurich will lose the benefit of its bargain with the Defendants – the posting of collateral to ensure that Ascent and the Individual Indemnitors, not Zurich, satisfy Ascent's bonded obligations.  Zurich simply cannot wait until all impending defaults have occurred, claims have been paid, and then litigate at that point.  Instead, Zurich is now entitled to its protections guaranteed by the GIAs and common law.

48.     Ascent and the Individual Indemnitors must grant full and immediate access to their financial condition and immediately post collateral in the amount of no less than $10,000,000.00, failing which Zurich should be entitled to liens as requested herein.  This is nothing more than what is dictated by the GIAs or equitable under the circumstances.

## FIRST CLAIM FOR RELIEF
### (Breach of Express Contract Against All Defendants)

49.     Zurich hereby incorporates by reference all the allegations contained above as though fully set forth herein.

50.     The Defendants entered into valid and enforceable contracts, the GIAs, with Zurich.

51.     Sufficient consideration supports the GIAs.

52.     Zurich substantially performed its obligations, if any, under the GIAs.

53.     The Defendants failed to meet their obligations under the GIAs, which constitutes a material breach.

54.     Defendants' breach of the GIAs has damaged Zurich, and Defendants are liable to Zurich for all losses and expenses incurred by Zurich as a result of the issuance of the Bonds, including, but not limited to, bond payments, attorneys' fees, consultant fees, expenses, and costs, all as provided by the terms of the GIAs.

16

## SECOND CLAIM FOR RELIEF
### (Common Law Indemnification Against Ascent)

55.    Zurich hereby incorporates by reference all the allegations contained above as though fully set forth herein.

56.    Ascent, as the principal under the Bonds, is required to indemnify and hold Zurich harmless from and against any and all liabilities, losses and expenses of any kind of nature, including, but not limited to, interest, court costs, expenses and attorney and consultant fees, imposed upon, sustained or incurred by Zurich on account of the issuance of the Bonds.

57.    Zurich has made demand upon Ascent to be indemnified and placed in funds for all losses sustained or to be sustained as a result of the issuance of the Bonds.

58.    Ascent has failed to meet its obligations to Zurich under Utah law.

59.    Ascent's failure to meet its obligations to Zurich under Utah law has damaged Zurich, and Zurich is entitled to damages.

## THIRD CLAIM FOR RELIEF
### (Injunctive Relief – Specific Performance Against All Defendants)

60.    Zurich hereby incorporates by reference the allegations contained above as though fully set forth herein.

61.    Pursuant to the GIAs, the Defendants are required to place Zurich in sufficient funds to cover any and all losses or expenses, including attorneys' and consultant's fees and costs, incurred or to be incurred by Zurich as a result of the issuance of the Bonds.

62.    There is no adequate remedy at law for Zurich to recover the benefit of the GIAs.

63.    Zurich has performed any obligations owed to the Defendants under the GIAs and/or Bonds.

64.    Zurich requests specific performance on the provisions of the GIAs, which require Defendants to grant access to books and records and/or to place Zurich in sufficient funds to cover any possible liability or loss for which Defendants are or will be obligated to indemnify Zurich under the terms of the GIAs.

65.    If Defendants have not or cannot place Zurich in sufficient funds, Zurich requests an equitable lien in the amount of no less than TEN MILLIONS DOLLARS ($10,000,000) ("Lien Amount") on any real property owned by the Defendants including, but not limited to (i) 310 W. Park Lane, Farmington, UT 84025, (ii) 478 Island View Circle, Farmington, UT 84025, (iii) 1493 Mirabella Way, Fruit Heights, UT 84037, and (iv) 498 N. Henry Street, Kaysville, UT 84037 (collectively, the "Property").

66.    If the Defendants do not or cannot place Zurich in sufficient funds, Zurich should also be given a valid equitable security interest, as collateral security in the Lien Amount, on any and all rights, title and interest of Defendants in and to all items, property, documents, etc. identified in the GIAs.

**FOURTH CLAIM FOR RELIEF**
**(Injunctive Relief – *Quia Timet* Against All Defendants)**

67.    Zurich hereby incorporates by reference the allegations contained above, as though fully set forth herein.

68.    Under the equitable doctrine of *quia timet*, Zurich is entitled to have Defendants place funds or other security with Zurich sufficient to cover any and all claims, demands and liability for losses, costs, and expenses of whatsoever kind or nature, including but not limited to, pre- and post-judgment interest at the maximum rate permitted by law accruing from the date of the breach of the GIAs or a breach of other agreements, court costs, counsel fees, costs of

investigation, accounting, engineering, construction management and any other outside consulting fees from and against any and all such losses, fees, costs and expenses, which Zurich may sustain or incur by reason or consequence of having issued the Bonds as set forth more fully above and in the GIAs.

69.    Despite demand, Defendants have failed to place Zurich in such funds in direct contravention of Zurich's *quia timet* rights.

70.    Pursuant to the terms of the Bonds, Zurich has guaranteed that if Ascent fails to take certain actions, the underlying bonded obligation will become due, and Zurich will pay the debt.

71.    Unless Zurich obtains an Order establishing equitable liens, Zurich will not be adequately secured for its obligations under the Bonds.

72.    If Zurich is unable to obtain an Order requiring Defendants to place Zurich in collateral as requested in Zurich's demands, Zurich will be irreparably harmed.

73.    Zurich is without a plain, speedy, or adequate remedy at law, pecuniary compensation would not afford adequate relief, it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief, and Zurich will be irreparably and permanently injured unless this Court grants the injunctive and equitable relief requested herein.

74.    Zurich is entitled to preliminary and permanent injunctive relief enforcing its *quia timet* rights and granting Zurich a valid equitable lien in the Lien Amount upon all assets and real property in which the Defendants have an interest, such liens to remain in place until Zurich has been placed in funds, and restraining Ascent and the Individual Indemnitors from transferring,

disposing, or otherwise liquidating any property owned by Defendants, real or personal, beyond reasonable living expenses, during the pendency of this matter.

75.    Zurich should also be given a valid equitable security interest in the Lien Amount on any and all rights, title and interest of Defendants in and to all items, property, documents, etc. identified in the GIAs.

76.    Upon information and belief, Defendants have equity in the Property described above and/or have received and continue to receive income and/or other intangible benefits from the operation of Ascent as a direct result of Zurich's issuance of the Bonds or other agreements. The interests of equity and fairness dictate that such equity, income and/or other intangible benefits be converted to equitable liens until Zurich is repaid.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment – Equitable Liens Against All Defendants)

77.    Zurich hereby incorporates by reference the allegations contained above, as though fully set forth herein.

78.    Zurich conferred a benefit on Defendants by extending surety credit and/or issuing the Bonds on behalf of Ascent.

79.    Defendants accepted and appreciated that benefit by profiting from Ascent's operations, which would not have been possible without the issuance of Zurich's surety credit and/or the Bonds.

80.    Defendants further accepted and appreciated that benefit by virtue of the equity in their real and personal property as a direct result of these profits, which equity would not have been possible without the issuance of Zurich's surety credit and/or the Bonds.

81.     Defendants agreed to defend, indemnify, and post collateral with Zurich in exchange for and pursuant to the terms of the GIAs.

82.     By failing and refusing to do so, Defendants have been and will continue to be unjustly enriched by keeping funds or other collateral to which Zurich is entitled pursuant to the GIAs and/or common law.

83.     It would be inequitable for Defendants to retain the benefit of Zurich's surety credit and/or the Bonds without complying with their concomitant obligations under the GIAs and/or common law to post collateral as promised to protect Zurich from losses.

84.     Under these circumstances and given the surety relationship between Zurich and Defendants, general considerations of right and justice dictate that Zurich be granted the right to have Defendants' assets applied to their obligation to post collateral with Zurich.

85.     Ask for equitable Liens on the Property here, so it's alleged in each cause of action so that if one cause of action gets dismissed, we still have a request for liens in the other action(s).

## SIXTH CLAIM FOR RELIEF
### (Declaratory Relief – Assignment Against All Defendants)

86.     Zurich incorporates by reference the allegations contained above, as though fully set forth herein.

87.     An actual and substantial dispute exists between Zurich and Defendants with respect to Zurich's right to be placed in funds and indemnified from loss under the Bonds.

88.     A prompt and judicial determination of the respective rights of the parties in these respects is necessary and appropriate.

89.     Pursuant to the GIAs, Defendants assigned certain rights to Zurich, and the assignments have been triggered by Defendants' defaults under the Bonds and GIAs.

90.     Zurich seeks a declaratory judgment that any and all of the assignment provisions have been triggered and the assignments should be effectuated and enforced until such time that the Lien Amount is satisfied, and such amount is paid in good funds to Zurich.

## IV.    CONCLUSION

WHEREFORE, for the foregoing reasons, Zurich requests judgment against Defendants as follows and for such further relief as the Court deems proper:

- For all losses, expenses, costs and attorneys' fees, plus pre- and post-judgment interest at the maximum rate allowed by law, incurred by Zurich as a result of Defendants' breach of the GIAs, as well as specific performance of the same;

- For Defendants to indemnify and hold Zurich harmless from and against any and all liabilities, losses and expenses of any kind of nature, including, but not limited to, interest, court costs, expenses and attorneys' fees, imposed upon, sustained or incurred by Zurich on account of the issuance of the Bonds;

- Due to Defendants' failure or inability to place Zurich in sufficient funds, Zurich requests an equitable lien in the Lien Amount (including attorneys' fees, costs, and expenses) to be placed on any real property owned in whole or in part by the Defendants including, but not limited to (i) 310 W. Park Lane, Farmington, UT 84025, (ii) 478 Island View Circle, Farmington, UT 84025, (iii) 1493 Mirabella Way, Fruit Heights, UT 84037, and (iv) 498 N. Henry Street, Kaysville, UT 84037;

- Zurich requests a valid security interest, as collateral security in the Lien Amount, on any and all rights, title and interest of Defendants in and to all items, property, documents, etc. identified in the GIAs;

- For preliminary and permanent injunctive relief requiring Defendants to grant access to books and records and to place Zurich in funds by money, property, liens or security interests in real or personal property, as determined by Zurich, and restraining each of Defendants' two members and the individual Indemnitors from transferring, disposing or otherwise liquidating any property, real or personal, beyond reasonable living expenses, during the pendency of this matter;

- For such further relief as the Court deems just and proper.

Respectfully submitted this 21st day of July, 2020.

THE HUSTEAD LAW FIRM
*A Professional Corporation*

*The Original Signature is on File at*
*The Hustead Law Firm, A Professional*
*Corporation*

*s/Connor L. Cantrell, Esq.*
Connor L. Cantrell, Esq.
The Hustead Law Firm, *A Professional*
*Corporation*
4643 S. Ulster Street, Suite 1250
Denver, CO 80237
(303) 721-5000
clc@thlf.com
*Attorneys for Zurich American Insurance*
*Company and Fidelity and Deposit Company*
*of Maryland*

Address of the Plaintiff:
1299 Zurich Way ZAIC
Schaumburg, IL 60196