THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY AND FIDELITY AND DEPOSIT COMPANY OF MARYLAND,<br><br>    Plaintiff,<br><br>v.<br><br>ASCENT CONSTRUCTION, INC.; BRAD L. KNOWLTON; SHONDELL SWENSON f/k/a SHONDELL KNOWLTON,<br><br>    Defendants and Third-Party Plaintiffs,<br><br>v.<br><br>DALLAS KNOWLTON d/b/a PFEIFFERHORN CONSTRUCTION,<br><br>    Third-Party Defendant. | **MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT REPORTS**<br><br>Case No. 1:20-cv-00089-DBB-CMR<br><br>District Judge David Barlow |

Plaintiff Zurich American Insurance Company and Fidelity and Deposit Company of Maryland ("Zurich") has filed suit to enforce four general indemnity agreements ("GIAs") signed by Defendant Ascent Construction, Inc. ("Ascent"). Zurich asserts that three of the GIAs were also signed by Ascent's president, Defendant Brad L. Knowlton, and that two of those GIAs were also signed by Shondell Swenson, Knowlton's former wife, as well as by J. Scott Johansen and Marlaine Johansen, Ascent's former CFO and his wife. The Johansens have since settled with Zurich and are no longer a part of this lawsuit.[1] The defendants executed the GIAs in

---

[1] *See* ECF Nos. 417–18.

favor of Zurich, a surety company that issued construction bonds for over two dozen projects, mostly in the greater Salt Lake City area. Zurich incurred losses when it paid out arbitration awards and other costs for defaulted projects. Zurich sought collateral and indemnification and filed this lawsuit to collect damages when it did not receive payment.

The defendants filed numerous counterclaims, crossclaims, and third-party claims. Specifically, Ascent and Knowlton filed counterclaims against Zurich and crossclaims against Swenson, while Swenson filed crossclaims against Knowlton. Finally, Ascent filed third-party claims against Knowlton's son, Dallas Knowlton ("Dallas").[2]

Several parties have now moved for summary judgment and for other relief. First, Zurich moves for summary judgment against Ascent and Knowlton on its claims for breach of contract and specific performance.[3] Ascent and Knowlton have each filed their own motions against Zurich, seeking summary judgment on four of Zurich's claims and partial summary judgment on specific issues.[4] Relevant to this dispute, Zurich moves to exclude the expert report of Derk Rasmussen and the testimony of non-retained experts Brad Knowlton and Scott Rasmuson.[5] In turn, Ascent and Knowlton jointly move to exclude the expert testimony of Zurich's experts Jack Nicholson and Lin Heath.[6]

---

[2] Because Brad and Dallas Knowlton share a last name, the court refers to the latter by his first name for purposes of clarity.
[3] Zurich's Renewed Mot. for Summ. J., ECF No. 337.
[4] Knowlton's Mot. for Summ. J., ECF No. 347; Ascent's Mot. for Summ. J., ECF No. 348.
[5] Mot. to Exclude Testimony of Brad Knowlton & Scott Rasmuson, ECF No. 327; Mot. to Exclude Testimony of Derk Rasmussen, ECF No. 328.
[6] Mot. to Exclude Zurich's Expert Jack Nicholson, ECF No. 320; Mot. to Exclude Zurich's Expert Lin Heath, ECF No. 321.

Second, Zurich moves for summary judgment against Swenson, also on its claims for breach of contract and specific performance.[7] This motion is identical to Zurich's motion against Ascent and Knowlton, but Swenson opposes the motion separately, asserting the defense of duress.[8] Relevant to this dispute, Zurich moves to exclude the expert testimony of Dr. Kyle Hancock.[9]

Third, Dallas Knowlton moves for summary judgment on the seven third-party claims asserted against him by Ascent.[10] Ascent, in turn, moves for partial summary judgment on a discrete issue about Dallas's fiduciary duties.[11]

Finally, Swenson moves for summary judgment on the five crossclaims asserted against her by Ascent and Knowlton.[12] Ascent and Knowlton have separately moved to exclude the expert testimony of Dr. Kyle Hancock.[13]

Having considered the briefing and relevant law, the courts finds that oral argument is unnecessary.[14]

## BACKGROUND

### A. Factual Background

Ascent is a construction company founded by Knowlton and Swenson in 2000.[15] In 2001, Ascent executed a GIA in favor of Zurich (the "2001 GIA").[16] The agreement was also signed by

---

[7] ECF No. 337.
[8] Swenson's Resp. to Zurich's Mot. for Summ. J., ECF No. 359.
[9] Mot. to Exclude Expert Testimony of Dr. Kyle Hancock, ECF No. 325.
[10] Dallas's Mot. for Summ. J., ECF No. 332.
[11] Ascent's Mot. for Partial Summ. J. Re: Fiduciary Duties, ECF No. 334.
[12] Swenson's Mot. for Summ. J., ECF No. 333.
[13] Mot. to Exclude Swenson's Expert Dr. Kyle Hancock, ECF No. 319.
[14] *See* DUCivR 7-1(g).
[15] Counterclaim, ECF No. 154 at ¶ 5.
[16] 2001 GIA, ECF No. 337-3.

Knowlton, Swenson, and the Johansens as individual indemnitors.[17] In exchange for the GIA,

Zurich acted as surety for Ascent, issuing numerous performance and payment bonds for

construction projects.[18] Under these bonds, Zurich and Assent were jointly liable to project

owners (performance bonds) and subcontractors and suppliers (payment bonds).[19] In the event

that Ascent defaulted on a project or failed to pay a subcontractor, Zurich was granted authority

under the GIA to complete the project or payment and seek indemnity from Ascent for any losses

incurred.[20]

Ascent's business grew and, as a result of that strength, Zurich released the individual

indemnitors (but not, Zurich alleges, Ascent) from the 2001 GIA in 2010.[21] In 2017, Ascent and

the individual indemnitors signed two new GIAs in consideration for Zurich issuing performance

and payment bonds on two large projects: the Sugarmont Apartments project, a contract worth

$62,750,000,[22] and the Station at Gardner Mill ("SGM") project, a contract worth $38,242,184.[23]

These two GIAs (the "2017 GIAs") were specific to the projects but Zurich alleges they did not

replace, relieve, or otherwise satisfy Ascent's obligations under the 2001 GIA.[24] Knowlton and

---

[17] *Id.* at 4–5.

[18] Decl. Paul W. Eaves, ECF No. 337-2 at ¶ 6; Ascent's Mem. in Opp'n, ECF No. 388 at 11 (not disputing that Zurich issued performance and payment bonds). For ease of reference, ECF citations are to PDF pages rather than internal document pages.

[19] ECF No. 337-2 at ¶ 5; ECF No. 388 at 12 (not disputing that Zurich guaranteed performance in the event of Ascent's default under the terms of the bonds). Ascent and Knowlton raise numerous objections to Zurich's undisputed facts. *See, e.g.*, ECF No. 388 at 11 (objecting under Federal Rules of Evidence 602 and 801/02). The objections are not well taken. Because Zurich offers admissible evidence in the form of a signed declaration and supporting exhibits, *see* ECF No. 337-2, the court finds that Ascent and Knowlton's objections fail to create a genuine dispute of material fact.

[20] ECF No. 337-3 at 2.

[21] ECF No. 337-2 at ¶¶ 6–7; ECF No. 388 at 13 (agreeing that the individual indemnitors were released).

[22] Sugarmont GIA, ECF No. 337-5; Sugarmont Bond, ECF No. 337-11.

[23] SGM GIA, ECF No. 337-6; ECF No. 337-2 at ¶ 10; ECF No. 388 at 14 (not disputing contract price).

[24] ECF No. 337-2 at ¶¶ 9–10.

Swenson began divorce proceedings in 2017,[25] but she nevertheless signed the 2017 GIAs. She alleges, however, that Knowlton obtained her signature under duress and through fraud.[26]

During the spring of 2019, Zurich began to receive correspondence from project owners regarding disputes with Ascent, as well as payment bond claims submitted by Ascent's subcontractors and suppliers.[27] That summer, Sugarmont, LLC (the project owner of the Sugarmont Apartments project) terminated Ascent and submitted a performance bond claim to Zurich.[28]

As further consideration for Zurich issuing bonds, Ascent and Knowlton (but not Swenson or the Johansens) signed another GIA on July 2, 2019 (the "2019 GIA").[29] This agreement did not reference a specific project, although Knowlton initially wanted to limit the agreement to the Bountiful City Hall project.[30]

Zurich received additional payment and performance bond claims in the fall of 2019 and winter of 2020.[31] On November 26, 2019, Zurich sent Ascent and the indemnitors a request to inspect Ascent's books and records.[32] Zurich alleges that Ascent did not provide this access for months and that the records were in disarray when Zurich inspected them in February 2020.[33]

---

[25] ECF No. 359 at 16.
[26] *See generally id.*
[27] ECF No. 337-2 at ¶ 17; *see also* Zurich's Reply Mem., ECF No. 396 at 5 n.12 (link to Sharefile page containing all 9,600 pages of bond claims). Ascent and Knowlton object that not all bond claims were attached to Zurich's Motion for Summary Judgment, *see* ECF No. 388 at 18–19, but have not disputed that these claims were provided during discovery.
[28] *See* Interim Arbitration Award, ECF No. 337-12 (containing details of the dispute between Sugarmont, LLC and Ascent).
[29] 2019 GIA, ECF No. 337-10.
[30] *See* Proposed 2019 GIA, ECF No. 347-4 at 6.
[31] ECF No. 337-2 at ¶¶ 18–19; *see also supra* note 27.
[32] Ltr. from Zurich to Knowlton dated Nov. 26, 2019, ECF No. 337-19.
[33] ECF No. 337-2 at ¶ 24.

5

By the end of March 2020, most of the project owners had terminated Ascent from the construction projects.[34] Between February 21, 2020, and April 3, 2020, Zurich sent three formal notice and demand letters to Ascent and the individual indemnitors asking them to indemnify and collateralize Zurich against the losses related to claims on the Ascent projects.[35] Zurich also sent hold-fund letters to owners of bonded projects in March 2020, which allowed for payment of the remaining contract funds to Zurich.[36] Zurich alleges that, despite the receipt of these contract funds, Zurich suffered millions of dollars in losses to complete the projects and pay subcontractors.[37]

Zurich worked to complete the projects through its general contractor, Nicholson Management ("Nicholson").[38] Zurich and Nicholson also hired several former Ascent employees in various capacities, including Knowlton's son Dallas.[39]

Zurich filed this lawsuit on July 21, 2020.[40] The court denied a motion for a temporary restraining order and preliminary injunction,[41] as well as a later motion for partial summary judgment,[42] to allow the defendants time for discovery. The parties have now submitted their motions for summary judgment, and Zurich has settled its claims against the Johansens.[43]

---

[34] *See, e.g.*, Bountiful City Hall Project Notice of Termination, ECF No. 337-13 at 51–52; South Jordan Fire Station Notice of Termination, ECF No. 337-14 at 1; APA Auditorium Project Notice of Default, ECF No. 337-15; West Valley Classroom Project Notice of Default, ECF No. 337-16.

[35] Ltr. from Zurich to Ascent & Indemnitors dated Feb. 21, 2020, ECF No. 337-21; Ltr. from Zurich to Ascent & Indemnitors dated Mar. 17, 2020, ECF No. 337-22; Ltr. from Zurich to Ascent & Indemnitors dated Apr. 3, 2020, ECF No. 337-23.

[36] *See, e.g.*, Ltr. from Zurich to SGM dated Mar. 4, 2020, ECF No. 337-24.

[37] ECF No. 337-2 at ¶¶ 33–35.

[38] *See* Zurich's Control Account, ECF No. 337-25 (listing payments to Nicholson); Excerpt of Nicholson Receipts, ECF No. 389-9; Excerpt of Nicholson Check Register, ECF No. 389-10.

[39] Decl. Dallas Knowlton, ECF No. 389-12 at ¶¶ 18–21.

[40] *See* Complaint, ECF No. 2.

[41] Order Denying Pl.'s Motion for TRO & Prelim. Inj., ECF No. 75.

[42] Mem. Decision & Order Denying without Prejudice Pl.'s Mot. for Partial Summ. J., ECF No. 251.

[43] ECF Nos. 417–18.

### B. Relevant Provisions of the GIAs

The language in the 2017 GIAs and 2019 GIA is identical in the relevant parts.[44] The agreement grants Zurich a broad right of indemnity:

> **INDEMNITY**: Indemnitors shall exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim, (c) any Indemnitor failing to timely and completely perform or comply with this Agreement, (d) Surety enforcing this Agreement or (e) any act of Surety to protect or procure any of Surety's rights, protect or preserve any of Surety's interests, or to avoid, or lessen Surety's liability or alleged liability. The liability of Indemnitors to Surety under this Agreement includes all Claims made on Surety, all payments made, Loss incurred, and all actions taken by Surety under the Good Faith belief that Surety is, would be or was liable for the amounts paid or the actions taken, or that it was necessary or expedient to make such payments or take such actions, whether or not such liability, necessity or expediency existed. Indemnitors shall promptly, upon demand, make payment to Surety as soon as liability or Loss exists, whether or not Surety has made any payment. An itemized statement of Loss sworn to by any officer of Surety or the voucher or other evidence of any payment, shall be *prima facie* evidence of the fact, amount and extent of the liability of Indemnitors for such Loss.[45]

The GIAs also grant Zurich the right to be placed in funds: "Indemnitors agree to promptly deposit with Surety, on demand, an amount of money that Surety determines is sufficient to fund any liability or Loss."[46] In addition, the GIAs grant Zurich the right of takeover: "If an Event of Default occurs, Surety shall have the right, in its sole discretion . . . to perform or arrange for the performance of such Bonded Contract."[47] Finally, the GIAs entitle Zurich "to injunctive relief and/or specific performance"[48] and provide Zurich the right to inspect the financial statements, books, and records of the indemnitors.[49]

---

[44] The language in the 2001 GIA is similar, but any differences are immaterial as the 2019 GIA covers all projects.
[45] 2019 GIA, ECF No. 337-10 at ¶ 2.
[46] *Id.* at ¶ 4.
[47] *Id.* at ¶ 8.
[48] *Id.* at ¶ 16.
[49] *Id.* at ¶ 11.

## STANDARD

A court may grant summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[50] Summary judgment is inappropriate if any material fact "may reasonably be resolved in favor of any party."[51] The moving party is also entitled to summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[52] Both evidence and reasonable inferences drawn from that evidence are construed in the light most favorable to the nonmovant.[53]

When the moving party has brought forward evidence which it believes demonstrates the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."[54] "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'"[55] The nonmoving party may do this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , or other materials[.]"[56] Of course, "[i]t is well settled in this circuit that [courts] can consider only admissible evidence in reviewing an order granting summary

---

[50] Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[51] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).
[52] *Celotex*, 477 U.S. at 323.
[53] *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).
[54] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[55] *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)).
[56] Fed. R. Civ. P. 56(c).

judgment."[57] So while a party "need not produce evidence in a form that would be admissible at trial, . . . the content or substance of the evidence must be admissible."[58]

Because this matter is before the court on federal diversity jurisdiction,[59] "substantive issues are controlled by state law and procedural issues are controlled by federal law."[60]

## DISCUSSION

### A.  The Dispute between Zurich and Ascent/Knowlton

The central dispute in this action is between the surety, Zurich, and the principal, Ascent, as well as Ascent's owner, Brad Knowlton.[61] Zurich moves for summary judgment against Ascent and Knowlton on its claims for breach of contract and specific performance.[62] Ascent and Knowlton have each filed their own motions against Zurich, seeking summary judgment on four of Zurich's claims and partial summary judgment on specific issues.[63] There are also three counterclaims that remain pending after the court dismissed the remainder of Ascent and Knowlton's counterclaims.[64] Finally, the parties move to exclude the expert testimony of several witnesses.[65]

---

[57] *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)).
[58] *Id.* (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)).
[59] *See* ECF No. 2 at ¶ 9 ("This [c]ourt has original subject matter jurisdiction over Zurich's claims pursuant to 28 U.S.C. § 1332 (diversity) because the amount of Zurich's claims against Defendants exceed[s] $75,000 . . . and Zurich is a citizen of a different state than each of Ascent and the Individual Indemnitors.").
[60] *Burnham v. Humphrey Hosp. Reit Tr., Inc.*, 403 F.3d 709, 712 (10th Cir. 2005) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).
[61] There is no meaningful difference between the position of Ascent and its president, Knowlton, in this litigation. Although it is undisputed that, unlike Ascent, Knowlton was released from the 2001 GIA, the distinction is immaterial because Knowlton signed the 2019 GIA, which covered all projects on which Zurich acted as Ascent's surety. ECF No. 337-10 at 6–7.
[62] ECF No. 337.
[63] ECF Nos. 347–48.
[64] Mem. Decision & Order, ECF No. 249. The remaining counterclaims are for breach of the covenant of good faith and fair dealing, civil conspiracy, and aiding and abetting Dallas's breach of fiduciary duty. *Id.* at 16.
[65] ECF Nos. 320–21, 327–28.

As an initial matter, the court notes that, despite the number of motions and claims filed, the parties' divergent theories of the case are not complicated. Zurich alleges that it suffered loss on payment and performance bonds that it was required to pay project owners, subcontractors, and suppliers after Ascent defaulted on its construction projects. Under the terms of the GIAs signed by Ascent and Knowlton, Zurich now seeks indemnity for its losses and collateral for the potential losses that remain in dispute.

Ascent and Knowlton do not specifically dispute the amount of money Zurich has paid on these bonds. Rather, they argue that they are only bound by the 2017 GIAs for the Sugarmont and SGM projects. In addition, they allege a conspiracy between Zurich, Swenson, and Dallas Knowlton in which the surety, acting in concert with Knowlton's ex-wife and son, improperly encouraged subcontractors to make payment bond claims, fomented dissatisfaction with Ascent among project owners, and poached various Ascent employees, all with the intent to allow Zurich to take over Ascent's construction projects.

Summary judgment for Zurich is warranted because Ascent and Knowlton remain bound by the GIAs, and because they fail to identify admissible evidence that, even when seen in the light most favorable to them, reasonably supports the existence of a conspiracy or provides evidence of Zurich's bad faith.

### 1.  The GIAs Are Valid and Enforceable

Ascent and Knowlton (collectively the "Defendants") argue that neither the 2001 GIA nor the 2019 GIA are valid against them. The court addresses each argument made by Defendants.

### a.  The 2001 GIA Binds Ascent

In 2010, Zurich released the individual indemnitors to the 2001 GIA.[66] Citing Utah Code

§ 15-4-4, Ascent maintains that a surety must make a written reservation of rights to prevent the

release of a co-obligor when other obligors are released. Because Zurich made no such written

reservation when it released the individual indemnitors, Ascent concludes that it also was

released from its obligations under the GIA.

Ascent misreads the statute. Utah Code § 15-4-4 provides that, in the absence of a

reservation of rights, "the obligee's release or discharge of one or more of several obligors . . .

shall discharge co-obligors *only to the extent provided* in Section 15-4-5."[67] But § 15-4-5 merely

allows for the liability of a non-released co-obligor to be reduced in some circumstances when a

released obligor has not paid as much of the claim as that obligor was obligated to pay—an

empty provision where none of the obligors had yet been found liable.[68]

Here, there was no liability established when Zurich released the individual indemnitors.

Instead, Zurich released the individual indemnitors because Ascent was performing so well.[69]

Zurich did not need to make a reservation of rights when it released the individual indemnitors

because the application of §§ 15-4-4 and 15-4-5 in these circumstances did not discharge Ascent

of any liability. Accordingly, Assent remains bound by the 2001 GIA.

### b.  The 2019 GIA Binds Ascent

Ascent maintains that the 2019 GIA is invalid because it was not signed by Ascent's

Chief Financial Officer. Ascent cites the deposition of Ben Holicky, Zurich's designated

---

[66] ECF No. 337-2 at ¶ 6.
[67] Utah Code Ann. § 15-4-4 (West 2023) (emphasis added).
[68] *See id.* § 15-4-5.
[69] ECF No. 337 at 7.

deponent under Federal Rule of Civil Procedure 30(b)(6), who averred that Zurich would reject as "improperly executed" an agreement that was not signed by "an officer on the operational side [i.e., Knowlton] and an officer on the finance side [i.e., Johansen]."[70] The 2019 GIA instructs a corporation to have both officers sign and includes signature lines for both officers.[71] It is undisputed that Brad Knowlton, as President of Ascent, is the only signature that appears on the 2019 GIA.[72]

But Zurich's best practices or preferred approach for its agreements do not supersede the requirements of a valid contract.[73] Under Utah law, the actions of an officer or agent are binding when such individual is acting on behalf of the corporation and within the scope of their authority.[74] Knowlton has never asserted that, as president of the company, he lacked authority to bind Ascent to contracts. And the GIA was executed within the ordinary course of Ascent's business dealings. Moreover, Knowlton had fired Johansen the month before Knowlton signed the GIA and it is unclear whether Ascent had even hired a new CFO. Also, there is no evidence that Zurich rejected the GIA; to the contrary, it signed it. That Ascent failed to provide a CFO's signature did not prevent the creation of a valid contract. Ascent is bound by the 2019 GIA.

---

[70] Dep. Benjamin Holicky, ECF No. 347-8 at 117:21–118:11.

[71] ECF No. 337-10 at 6.

[72] Id.

[73] Under Utah law, a contract requires an offer, acceptance, and consideration. *Golden Key Reality, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985). All elements are present here.

[74] *Mitchell v. Wells Fargo Bank*, 280 F. Supp. 3d 1261, 1297 (D. Utah 2017); *see Larson v. Wycoff Co.*, 624 P.2d 1151, 1155 (Utah 1981); *Merrion v. Scorup-Somerville Cattle Co.*, 134 F.2d 473, 477 (10th Cir. 1943) (citing *Carlquist v. Quayle*, 218 P. 729, 731 (Utah 1923)).

### c. The 2019 GIA Binds Knowlton

Knowlton maintains that the 2019 GIA does not bind him, arguing that an alleged irregularity in the final version of the contract demonstrates that he never signed the contract.[75] But Knowlton provides no sworn affidavit regarding the execution of the 2019 GIA and submits no admissible evidence to support his theory.

Zurich, on the other hand, submits the affidavit of Tina Davis, the senior vice president of Marsh USA, Inc. ("Marsh"), who acted as Ascent's broker in obtaining surety bonds from Zurich for the Bountiful City Hall project.[76] Davis explains what transpired as follows: Zurich required both Ascent and Knowlton to execute a general indemnity agreement in exchange for the surety bond that Zurich issued on the Bountiful project.[77] When Ascent and Knowlton first returned this agreement to Zurich, Knowlton included a hand-written emendation above the signature block for Ascent that read: "for Bountiful Courts remodel."[78] Holicky then emailed Davis the following message: "The GIA needs to be redone. Brad [Knowlton] included language on the first signature page indicating this is for the Bountiful City Hall Project. I told you yesterday we would not take a project specific indemnity agreement, and that Brad [Knowlton]'s indemnity would apply to all bonds written by Zurich."[79] Davis then asked Knowlton to execute a new agreement that was not limited to a specific project. She obtained the new GIA from Ascent's headquarters and returned it to Holicky.[80]

---

[75] ECF No. 388 at 50.
[76] Aff. Tina Davis, ECF No. 52-4.
[77] *Id.* at ¶ 5.
[78] *Id.* at ¶ 8.
[79] Email from Benjamin Holicky to Tina Davis, ECF No. 52-5 at 1.
[80] ECF No. 52-4 at ¶¶ 10–12.

The finalized GIA includes an updated signature page that does not contain the "for Bountiful Courts remodel" emendation and which Knowlton signed as Ascent's president.[81] But the following page, containing Knowlton's notarized signature as an individual indemnitor, appears identical to the corresponding page on the old, rejected version of the GIA.[82] Knowlton argues that this renders the finalized GIA a forgery.

Knowlton does not raise a genuine dispute about the existence of a valid contract. There is no dispute that Zurich would not issue the $7.2 million bond for the Bountiful project without a GIA signed by both Ascent and Knowlton (one that was not limited to a specific project), and that Zurich *did* issue the bond after receipt of what appeared to be a properly executed GIA signed by both Ascent and Knowlton. Knowlton provides no evidence that he objected to the 2019 GIA prior to this litigation. Moreover, because Knowlton has provided no sworn statement regarding the execution of the 2019 GIA, Davis's sworn affidavit is the only competent evidence explaining what transpired.

When opposing a motion for summary judgment, a party "cannot rest on ignorance of facts, on speculation, or on suspicion."[83] Accordingly, there is no genuine dispute that Knowlton's signature was valid and that he is bound by the 2019 GIA.

### d. Marsh Is a Licensed Insurance Broker

In a final attempt to insist that the indemnity agreements that undergird $200 million in bonded projects are invalid, Ascent and Knowlton assert that Marsh was not licensed as an insurance broker in Utah until 2006 and has never been licensed as a broker for surety bonds.

---

[81] *See* Finalized 2019 GIA, ECF No. 347-2 at 6.
[82] *Compare* ECF No. 347-2 at 7, *with* ECF No. 347-4 at 7.
[83] *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (citation omitted).

Zurich has provided an affidavit from Randy Overstreet, the Producer Licensing Manager for the Financial Regulation & Licensing Division of the Utah Insurance Department, who states that Marsh has been a licensed Utah surety broker since at least April 14, 2000.[84] Attached to Overstreet's affidavit are copies of the relevant licenses and an explanation of why those licenses authorize Marsh to sell surety bonds to customers in the construction industry.[85]

There is no genuine dispute that Marsh is a licensed Utah broker and that the GIAs were validly executed and enforceable against Ascent (all four GIAs) and Knowlton (the 2017 and 2019 GIAs).

### 2.  Ascent and Knowlton Breached the GIAs

Under Utah law, "[t]he elements of a prima facie case for breach of contract are '(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages.'"[86] The court finds that Zurich has established the necessary elements to demonstrate that Ascent and Knowlton breached the GIAs.

As discussed above, the GIAs are valid and enforceable contracts. The GIAs require both Ascent and Knowlton to "exonerate, indemnify, and hold Surety harmless from any and all liability and Loss, sustained or incurred, arising from or related to: (a) any Bond, (b) any Claim . . . or (e) any act of Surety . . . to avoid, or lessen Surety's liability or alleged liability."[87]

---

[84] Aff. Randy Overstreet, ECF No. 387-3 at ¶ 3.
[85] *Id.* at 2–5.
[86] *Daz Mgmt., LLC v. Honnen Equip. Co.*, 2022 UT 15, ¶ 29 n.26, 508 P.3d 84 (quoting *Richards v. Cook*, 2013 UT App 250, ¶ 6, 314 P.3d 1040).
[87] ECF No. 337-10 at ¶ 2. The court cites to the 2019 GIA; the language in the 2017 GIAs is identical.

There is no genuine dispute that Zurich performed in accordance with the GIA,[88] as Zurich issued over $200 million in payment and performance bonds for Ascent projects.[89]

There is also no genuine dispute that project owners terminated Ascent from construction projects and issued payment and performance bond claims. Defendants object that Zurich has not attached every bond claim as an exhibit to its motion, but Zurich counters that it provided a sworn Declaration, that it also has provided the 9,600 pages of claims in discovery, and that Defendants have not made specific objections to any of these claims.[90] The court finds that Zurich has submitted sufficient evidence of the payments it made as a result of bond claims and the termination of Ascent's projects, and that the evidence remains unrebutted.[91] For instance, Defendants do not dispute that Sugarmont, LLC brought suit against Ascent, a dispute that was referred to arbitration and resulted in an award of $2,839,319.58 against Ascent.[92] Similarly, Defendants do not dispute that the owner of SGM filed a demand for arbitration and ultimately

---

[88] Defendants argue that Zurich performed in bad faith, which the court treats as a defense to Defendants' breach and discusses below.

[89] ECF No. 337-2 at ¶ 4. Zurich was not required to issue bonds under the terms of the GIAs themselves, *see* ECF No. 337-10 at ¶ 12, but Zurich's willingness to serve as surety for Ascent's projects was the consideration for Ascent and Knowlton's commitments under the GIAs.

[90] *See supra* note 27.

[91] Beyond the Eaves Declaration, the court does not find in the record detailed evidence of default or termination for the following projects: Sonoma Spring Apartments, Crescent Heights Senior Living Center, Sandy City Public Works Building, DWR Regional Office, Freeport Building Freezer Addition, Deep Harvest Dispensary, New Herriman Liquor Store, Salt Lake Community College Renovation, New Library at Daybreak, Early Light Academy, Layton Amphitheater, Jordanelle District Administration Building, and Wheeler Farm. Zurich reports far fewer losses for these projects—about $1.3 million in losses for the Wheeler Farm project and $1 million for everything else listed—than the approximately $24 million in losses for the larger projects. However, under the GIAs signed by the parties and as the court discusses more fully below, the Eaves declaration serves as "*prima facie* evidence of the fact, amount and extent of the liability of Indemnitors." ECF No. 337-10 at ¶ 2. Defendants have not contested these defaults: they have not provided any contrary evidence from the project owners or subcontractors and have not objected to any of the itemized costs listed in the control account attached to the Eaves declaration. *See* ECF No. 337-25. The court therefore finds that Zurich need not provide additional documentation for the smaller projects.

[92] Exs. in Support of Ascent's Mem. in Opp'n, ECF No. 389-1.

settled for $365,000.[93] Other detailed evidence of terminated projects includes: (1) a notice of termination and performance bond claim on the Bountiful City Hall project;[94] (2) a notice of termination and performance bond claim on the South Jordan fire station project;[95] (3) a notice of default and performance bond claim on the APA Auditorium project;[96] (4) a notice of default and performance bond claim on the West Valley Classroom project;[97] (5) a notice of termination and performance bond claim on the West Bountiful Elementary project;[98] (6) an arbitration award from the HCA St. Mark's Hospital project;[99] and (7) payment bond claims relating to the Elko County School District project.[100]

Neither Ascent nor Knowlton have provided any funds to Zurich to indemnify the surety for its losses.[101] "Under the plain language of the contract, it is apparent that failure to pay [surety] upon demand would constitute breach."[102] Both Ascent and Knowlton have therefore breached the GIAs and their failure to indemnify has resulted in damages to Zurich.

Ascent and Knowlton counter that Zurich has not suffered damages because it has not adequately accounted for the value of the construction projects it took over. The only evidence Defendants cite for this proposition is Knowlton's declaration, in which he states: "Based on

---

[93] ECF No. 389-2.
[94] City of Bountiful's Notice of Termination, ECF No. 337-13.
[95] City of South Jordan's Notice of Termination, ECF No. 337-14.
[96] Utah Charter Academies, Inc.'s Notice of Default (APA Auditorium), ECF No. 337-15.
[97] Utah Charter Academies, Inc.'s Notice of Default (West Valley Classroom), ECF No. 337-16.
[98] Davis School District Notice of Termination, ECF No. 337-17.
[99] ECF No. 337-2 at ¶ 19(ix). Zurich does not attach the arbitration award but does cite the arbitration case.
[100] *Id.* at ¶ 19(vii). Zurich has not attached the payment bond claims but these amounts are recorded in the control account. *See* Control Account, ECF No. 337-25 at 14–15.
[101] ECF No. 337-2 at ¶ 21.
[102] *United Pac. Ins. Co. v. Knudsen Constr, Inc.*, No. 2:97-cv-00235, 2001 WL 693997, at *4 (D. Utah May 6, 2001).

records available to me, and to the best of my recollection, Ascent had over $130 million of contracted New Work for the first 6 months of calendar year 2020."[103]

This testimony is not admissible and cannot create a genuine dispute of material fact. Defendants have not provided a copy of this "New Work" schedule, which renders the cited figure speculative. Even if the speculative testimony were admissible, the estimated contract price of planned construction work in the future simply does not permit a determination of value. The estimated total contact price of future projects is not evidence of the profit available from those projects or, even more importantly here, the loss that could result through mismanagement or default of those projects. In addition to the lack of foundation provided for Knowlton's estimate of new work,[104] Defendants have not explained whether the "New Work" included the projects at issue in this lawsuit, future projects for which Zurich had not yet issued bonds, or projects in which Zurich was not involved at all. The court therefore finds this speculative estimate to be inadmissible: it is unusable for calculating Zurich's damages or assessing purported additional assets at Ascent.

Defendants further argue that Zurich focuses only on the liabilities from the projects it took over and "fails to give full credit for the Revenue streams that it took . . . ."[105] But Zurich does give full credit to the $22,488,130.96 in contract receipts that it received from the defaulted projects. To the extent that Defendants' real argument is that more money was owed on the

---

[103] Decl. Brad Knowlton, ECF No. 389-8 at ¶ 9.
[104] Zurich alleges that it repeatedly asked for this documentation during discovery but received nothing. *See, e.g.*, Discovery Dispute Correspondence, ECF No. 396-6.
[105] ECF No. 388 at 51. Ascent also argues that it "is entitled to an offset for the security already provided to Zurich under the UCC." *Id.* at 50. But it does not specify the amount or type of that security. *See id.* To the extent this is an oblique reference to the $130 million figure addressed elsewhere, that claim is insufficiently supported to survive summary judgment. On the other hand, if it is intended to reference credit for any future payments Zurich may receive from project owners for the projects in question, those amounts would be applied against the judgment.

contracts than Zurich received, Defendants have provided no accounts specifying the value remaining in the projects when Zurich stepped in. The only evidence provided to the court is a schedule of available funds for certain projects that Knowlton attached to his first declaration.[106] That schedule is incomplete and based only on Knowlton's "knowledge, experience, and records available to me."[107] Still, the figures comport well with the contract receipts reported by Zurich. For instance, Knowlton suggests that there are $7,703,553 of available funds remaining with the South Jordan public works project (the police and fire station), and Zurich reports receiving $7,981,670.49 in contract receipts. Similarly, Knowlton cites $5,956,187 of available funds remaining in the West Bountiful Elementary project; Zurich reports receipts of $6,224,615.69.[108] Of course, what is missing from Knowlton's schedule of outstanding funds are the expenses Zurich was required to pay to complete the projects.

Zurich has provided a detailed account of the money received and spent on each of the projects it took over. The GIAs provide that "[a]n itemized statement of Loss, sworn to by any officer of Surety . . . shall be *prima facie* evidence of the fact, amount and extent of the liability of Indemnitors for such Loss."[109] Zurich has provided that sworn itemization through the declaration of Paul Eaves and the attached control account of all relevant transactions, which includes a project-by-project analysis of profits and loss and a day-by-day ledger of all checks

---

[106] *See* ECF No. 389-8 at 18.

[107] *Id.* at ¶ 13.

[108] *Compare id.* at 18, *with* ECF No. 337-25 at 2. The two major discrepancies are for the Bountiful City Hall project (although for this project Zurich cites several million dollars *more* in receipts) and the APA Auditorium project. The APA Auditorium project had a contract price of $10 million and Knowlton avers that nearly $9.4 million of these funds are still available. ECF No. 389-8 at 18. Zurich claims that it has not received any contract funds for this project. ECF No. 337-2 at ¶ 19(iv); *see also* ECF No. 337-25 at 2.

[109] ECF No. 337-10 at ¶ 2.

and invoices.[110] Zurich has therefore provided prima facie evidence of the amount of its damages as follows:

| | |
|---|---|
| $17,461,781.40 | payments to subcontractors and suppliers (payment bond claims) |
| $28,243,493.55 | payments to project owners (performance bond claims) |
| $2,916,874.71 | expert consulting fees |
| ($22,488,130.96) | contract receipts from project owners |
| **$26,134,018.70** | **total losses**[111] |

Courts in this district and elsewhere have upheld similar *prima facie* clauses in indemnity agreements:

> The [indemnity agreement] states[:] "An itemized, sworn statement of an employee of Company, or other evidence of payment, shall be prima facie evidence of the propriety, amount and existence of Indemnitors' liability. . . . These clauses have been routinely upheld across the country and this court has recently upheld such a clause affirming that such clauses are satisfied by providing sworn, itemized statements that are part of the record.[112]

Once a surety has met its burden to show that *prima facie* evidence of its losses, courts have also granted summary judgment where an indemnitor fails to raise a genuine issue in rebuttal.[113]

Defendants have not made specific objections to any of the amounts sworn to in the Eaves declaration or detailed in the accompanying control account, with two exceptions. First, Ascent and Knowlton assert that Zurich lost only $365,000 on the SGM project. This figure represents the amount of the arbitration award but does not include the legal fees necessary to obtain that award or the cost "to indemnify SGM from the claims of Subcontractors including

---

[110] ECF No. 337-25.

[111] *See id.* at 1.

[112] *Travelers Cas. & Ins. Co. of America v. Cracar Constr. Co.*, No. 2:17-cv-00100, 2018 WL 3873678, at *3 (D. Utah Aug. 15, 2018) (citing *Ins. Co. of the W. v. Wallace Inv. Ltd. P'ship*, No. 2:11-cv-00500, 2013 WL 6858306 (D. Utah Dec. 30, 2013)).

[113] *See, e.g., Ins. Co. of W. v. Eagle Mountain Invs., LLC*, No. 2:11-cv-00976, 2013 WL 3873227, at *2 (D. Utah July 25, 2013) (granting summary judgment to surety where indemnitors did not present evidence of unreasonable fees or a failure to mitigate damages).

those that have filed mechanic's liens" that was ordered as part of the arbitration award.[114] These subcontractor claims alone total $4,880,261.90.[115] Including the arbitration award plus costs and fees, the total losses rise to $6,798,491.69.[116]

Second, Ascent and Knowlton maintain that losses on the Sugarmont project are limited to the $2,839,319.58 arbitration award. Again, Defendants neglect to include the legal fees necessary to obtain that award. Zurich provides evidence of an additional $320,958.81 in losses from those fees and from a payment claim.[117]

For the foregoing reasons, the court finds that Zurich has carried its burden to establish a prima facie case of breach of contract. The burden therefore shifts to Ascent and Knowlton to establish any affirmative defenses.[118] Other than the previously addressed arguments about the SGM and Sugarmont projects, Defendants have foregone objections to any of the specific amounts listed in Zurich's control account in favor of more generalized objections that the court discusses below.

### a.  No Evidence that Zurich Acted in Bad Faith

The primary defense Ascent and Knowlton raise is that Zurich acted in bad faith.[119] They put forward this theory both as a counterclaim (alleging breach of the covenant of good faith and fair dealing) and as an affirmative defense. Courts have recognized that

---

[114] Interim Award, ECF No. 396-1 at 8.

[115] Ltr. from Connor L. Cantrell, ECF No. 396-2 at 4.

[116] ECF No. 337-2 at ¶ 19(viii); ECF No. 337-25 at 2, 13–14.

[117] ECF No. 337-25 at 2, 14.

[118] *See Hous. Auth. of New Haven v. United States*, 140 Fed. Cl. 773, 790 (Fed. Cl. 2018).

[119] Ascent and Knowlton argue that Zurich was first to breach the GIAs by: (1) acting in bad faith and (2) failing to use reasonable care with Ascent's assets. ECF No. 388 at 32–40. As discussed below, Ascent and Knowlton fail to provide sufficient evidence to create a genuine issue of material fact that Zurich breached the GIAs. But even assuming this breach occurred, Ascent and Knowlton further fail to establish that Zurich was first to breach because they have not identified adequate record evidence from which a reasonable jury could conclude that Zurich's alleged bad acts or failures occurred before Ascent and Knowlton's breaches of the GIAs.

the only exception to a surety's right of reimbursement is "when the payment by the surety has been made through fraud or lack of good faith on the part of the surety . . . . Thus, to avoid summary judgment, it is defendant's burden to come forward with evidence upon which the jury could find bad faith or fraud . . . ."[120]

Defendants argue that Zurich acted in bad faith because it conspired with project owners, subcontractors, suppliers, and Knowlton's own family to encourage payment and performance bond claims and to persuade project owners to file notices of default, thereby allowing Zurich to take over the projects. As evidence of this allegedly extensive conspiracy, Defendants cite three sources: (1) the two declarations of Brad Knowlton; (2) the declaration of Dallas Knowlton; and (3) the declaration of Chris Wardle.

In his two declarations, Knowlton states that "Zurich's actions in taking over the company's projects . . . made it difficult or impossible for Ascent to perform its construction contracts on Zurich's bonded projects" because Ascent was "deprived . . . of the money and manpower necessary to continue as a going concern . . . ."[121] He also avers that "Zurich effectively took over . . . all of Ascent's accounts receivable and most of its pending construction projects by approximately February of 2020."[122] But Zurich does not dispute that it took over Ascent's projects *after* project owners declared Ascent to be in default. The GIAs give Zurich that right.[123] And Defendants do not dispute that the Sugarmont project ran into trouble in the summer of 2019 and that other projects faced problems throughout the fall of 2019, months

---

[120] *Fid. & Guar. Ins. Co. v. Constr. Advantage, Inc.*, No. 1:08-cv-460, 2010 WL 726024, at *5 (W.D.N.C. Feb. 25, 2010) (quoting *Fid. & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983)).
[121] Decl. Brad Knowlton, ECF No. 389-17 at ¶ 6.
[122] ECF No. 389-8 at ¶ 6.
[123] *See* ECF No. 337-10 at ¶ 8 (stating that in the event of default, the surety "is authorized to take possession of any part or all of the work, materials and equipment under any Bonded Contract").

before Zurich stepped in. Knowlton's declarations fail to provide evidence that Zurich was the source of these troubles.

The declaration of Dallas Knowlton provides no help to Defendants. Dallas declares that he left Ascent in February 2020 to start Pfeifferhorn Construction.[124] He then worked with Zurich's contractor, Nicholson, to help finish "construction projects that Ascent had failed to complete."[125] He notes that Nicholson hired other former Ascent employees as well.[126] But there is nothing suspicious about Zurich's actions. By February 2020, nearly all of Ascent's projects were on the brink of default, and Zurich had already received multiple payment and performance claims. The surety was therefore fulfilling its obligation under the bonds to step in where the principal had failed to finish a project. Moreover, the GIA provides that in the event of default, "Surety shall have the right, in its sole discretion . . . to perform or arrange for the performance of such Bonded Contract."[127] Courts have routinely upheld a surety's choice of contractor to finish a project—even to the extent that the surety, to the project owner's dismay, may elect to employ the original defaulted contractor.[128] And it is unsurprising that Zurich chose to employ people with prior knowledge of the project to minimize costs. Indeed, Dallas "believed that [his] consulting work for Zurich would help reduce the potential liability of all of the parties who may be obligated to indemnify Zurich."[129]

---

[124] ECF No. 389-12 at ¶ 17.
[125] *Id.* at ¶¶ 18, 23.
[126] *Id.* at ¶ 21. Dallas specifically names Paul Lindsey, Jason Hawksey, and Mike Thompson. No declarations or affidavits been provided from any of these employees. *See* Docket.
[127] ECF No. 337-10 at ¶ 8.
[128] *See St. Paul Fire & Marine Ins. Co. v. VDE Corp.*, 603 F.3d 119, 125 (1st Cir. 2010) (upholding surety's employment of the original contractor to complete construction project against project owner's protest); *see also St. Paul Fire & Marine Ins. Co. v. City of Green River*, 93 F. Supp. 2d 1170, 1178 (D. Wyo. 2000), *aff'd*, 6 F. App'x 828 (10th Cir. 2001) (unpublished) (allowing surety to use employees of original contractor to complete construction project).
[129] ECF No. 389-12 at ¶ 30.

Finally, Ascent and Knowlton provide the declaration of Chris Wardle, an employee of Mountain Valley Glass ("MVG") who worked on the Bountiful City Hall project. Wardle states that in February 2020, he was told by Dallas to stop fulfilling MVG's obligations to Ascent, as Zurich was taking over the project and would pay more for the same work than Ascent paid. According to Wardle, Dallas's goal "was to make Brad and Ascent look bad, which would ultimately lead to Ascent defaulting."[130] Moreover, Wardle avers that Paul Lindsey, Ascent's project manager, was paid by Zurich to get his contractor's license so that he could help Zurich manage projects it was taking over from Ascent—and that this payment occurred in the three weeks before Ascent defaulted on the Bountiful project.[131] Wardle also describes conversations with Mason Fleming, who worked for Nicholson and allegedly revealed to Wardle an intent to make sure the Bountiful project was not profitable so that Zurich could "go after Brad for costs . . . ."[132]

Wardle's declaration does not create a genuine issue of material fact. First, the declaration is unsigned and therefore inadmissible.[133] But even were the court to consider Wardle's allegations, it finds they do not provide evidence of bad faith. Wardle's primary assertions relate to conduct that occurred in February 2020, when it is undisputed that Ascent's construction projects were already deeply in trouble and long after Zurich had been stonewalled in its requests under the GIAs to examine Ascent's financials. Wardle's supposition that Dallas's goal in asking MVG to hold off work was to lead Ascent to defaulting is mere speculation and is

---

[130] Decl. Chris Wardle, ECF No. 389-18 at ¶ 14.
[131] *Id.* at ¶ 24.
[132] *Id.* at ¶ 19.
[133] *Id.* at 6. Given Defendants' arguments about the skepticism the court should employ regarding their own signatures on the GIAs, the lack of signature on Wardle's declaration, which was pointed out in the summary judgment briefing, is especially troublesome.

also belied by the comments of the project owner in the notice of termination.[134] Indeed, contrary to expressing frustration that MVG was not performing its duties, the owner stated that Ascent was not paying MVG:

> Ascent also did not show any payments to Mountain Valley Glass even though they have been working on the project. Brad [Knowlton] said that he believed it was because of unapproved materials. There was also discussion on whether or not Ascent even has a contract with Mountain Valley Glass. The contract had previously been requested by Bountiful and was again requested in the meeting but was not provided. Ascent finally provided a copy of an agreement between Ascent and Mountain Valley Glass after the meeting.[135]

The notice of termination, dated March 19, 2020, cited months of "repeated complaints from subcontractors that they are not being paid" and "weeks of failure to provide payment and financial information[.]"[136] Nowhere during this dispute does Ascent assert that Zurich was poaching subcontractors or otherwise causing Ascent's financial problems.

Finally, Wardle's statements about Fleming's comments are hearsay and Defendants offer no explanation for why they would be admissible. Also, Fleming allegedly made the comments mostly in the summer of 2020,[137] long after Zurich had taken over the projects; therefore, even taken as true, Fleming's statements are more relevant to the question of whether Zurich mitigated damages (discussed below) than any bad faith Zurich exhibited in performing its duty to finish projects under the terms of the construction bonds.[138]

---

[134] *See* ECF No. 337-13.
[135] *Id.* at 52.
[136] *Id.* at 1, 51.
[137] ECF No. 389-18 at ¶¶ 18–19.
[138] Even if the statements were admissible, on this record, no reasonable jury could conclude that Zurich planned to run up its own losses to damage Knowlton. Zurich could at most hope to break even by successfully collecting a possible future judgment for full indemnification against Ascent and the other indemnitors.

Defendants' theory relies on the assumption that Zurich was stepping into profitable projects and had something to gain by taking over—a supposition undermined by the extensive evidence of Defendants' mismanagement outlined in the notices of termination and declarations of default.[139] Defendants argue that Zurich can "afford a temporary debit on its balance sheet to obtain a much larger credit later on"[140] but have provided no evidence that this "credit" existed or realistically ever could. Speculation is not a basis for resisting summary judgment.[141] Additionally, the GIAs require that "[a]ny remaining funds held by Surety after payment of all sums due to Surety under this Agreement shall be returned upon the complete release and/or discharge of Surety's liability under all Bonds."[142] No reasonable jury could conclude that Zurich ran up its own costs to make Ascent or Knowlton suffer or to gain some undefined and unsupported "credit" in the future.

"Conclusory allegations of bad faith are insufficient to defeat a motion for summary judgment in favor of a surety seeking to enforce an indemnification agreement."[143] Relying on unsupported declarations, Defendants insist repeatedly that Zurich acted in bad faith but fail to point to any instance where Zurich's actions led to the problems on the projects that caused

---

[139] *See, e.g.*, ECF No. 337-13 at 51–52 (notice of termination from Bountiful City Hall project citing months of repeated complaints from subcontractors); ECF No. 337-14 at 1 (notice of termination from South Jordan Fire Station project citing "[f]ailure to adhere to the progress schedule, failure to supply sufficient skilled workers, failure to supply suitable material, failure to supply suitable equipment, [and] inability to pay debts generally as they become due"); ECF No. 337-15 (notice of default from APA Auditorium project citing failure to pay subcontractors, failure to account for funds, repeated failures to meet timetables and milestones, delays of over three months in the completion of certain portions of the project, and failure to communicate information to the owner); ECF No. 337-16 (notice of default from West Valley Classroom project citing similar failures to the APA Auditorium project).

[140] ECF No. 388 at 25.

[141] *Bird*, 832 F.3d at 1199.

[142] ECF No. 337-10 at ¶ 4.

[143] *Gen. Accident Ins. Co. of Am. v. Merritt-Meridian Constr. Corp.*, 975 F. Supp. 511, 518 (S.D.N.Y. 1997).

Zurich to become involved. The court therefore finds that Defendants have failed to raise a genuine issue about whether Zurich acted in bad faith.

### b.   No Evidence that Zurich Failed to Use Reasonable Care with Collateral

Defendants argue that, under Utah law, "a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession."[144] It is unclear exactly how Defendants believe that Zurich has breached this duty to use reasonable care. Defendants have failed to show that there was more value remaining in the projects than Zurich obtained. And Zurich reduced its requested damages award by the amount of contract proceeds it received from project owners.[145] To the extent that Defendants' argument is a restatement of their claim that Zurich mismanaged the projects it took over, the court addresses this argument below.

### c.   No Evidence that Zurich Failed to Mitigate Damages

Ascent and Knowlton maintain that Zurich did not mitigate its damages because it (1) failed to agree to a mitigation plan; and (2) overpaid its contractor and subcontractors. In support, Knowlton states that he had a discussion with Eaves in March 2018 in which he proposed that Zurich loan Ascent $2 million to $3 million to help Ascent work through its temporary problems.[146] But a surety has no duty to loan its indemnitor money to ward off the potential termination of an indemnitor's construction projects.[147] Moreover, this conversation purportedly occurred over a year before Ascent ran into trouble with the Sugarmont project. As Zurich points out, Eaves was not involved with the Ascent matters until Zurich received bond

---

[144] ECF No. 348 at 14 (citing Utah Code Ann. § 70A-9a-207(1) (West 2023)).

[145] *See* ECF No. 337-25 at 1 (citing $22,488,130.96 of contract receipts).

[146] ECF No. 389-17 at ¶ 8.

[147] *See Fid. & Deposit Co. of Md. v. Douglas Asphalt Co.*, No. CV507-02, 2008 WL 5351039, at *9 (S.D. Ga. Dec. 22, 2018), *aff'd* 338 F. App'x 886 (11th Cir. 2009) (unpublished) (holding that surety had no duty to fund defaulted principal).

claims and notices of default.[148] Therefore, Knowlton's recollection is either inaccurate or it simply demonstrates that Ascent was facing financial difficulties long before it began to default on projects.

Defendants' larger contention is that Zurich overspent on the cost of completion, accusing Zurich of "running up exorbitant costs . . . to drain the projects of all profit."[149] Knowlton states: "It is my opinion, based on my knowledge of the construction industry, that it appears that Zurich has been paying Nicholson Management above-market rates for its management services, compared to like services in the industry that I am aware of."[150] But Knowlton's opinion is not supported by citations to any facts in the record or evidence of standard rates.[151] Although Defendants point out that Zurich paid Nicholson around $16 million from May 2020 to May 2021,[152] this figure is unsurprising, as Nicholson was the primary contractor Zurich used to complete the projects and project costs were high, thereby resulting in losses to Zurich.[153] In any event, the GIAs give Zurich substantial discretion to "perform or arrange for the performance of such Bonded Contract" after default.[154] No reasonable factfinder could conclude that Zurich failed to mitigate damages.

---

[148] ECF No. 396 at 7 n.15.
[149] ECF No. 388 at 42.
[150] ECF No. 389-8 at ¶ 24.
[151] *See Devs. Sur. & Indem. Co. v. Barlow*, 628 F. App'x 980, 985 (10th Cir. 2015) (unpublished) ("Under Utah law a damages judgment in favor of a party is proper if the party 'present[s] a prima facie case of its damages' and the other party fails to present any contrary evidence, such as the unreasonableness of the requested amount." (citation omitted)).
[152] ECF No. 388 at 26.
[153] ECF No. 396 at 6.
[154] ECF No. 337-10 at ¶ 8.

The GIAs are unambiguous contracts that must be enforced according to their terms.[155] The indemnitors "are bound by the terms of the Indemnity Agreement, and as such are required to indemnify [Zurich] for its losses and expenses in the amount provided by [Zurich]."[156] Because Defendants have failed to raise a genuine issue about whether Zurich acted in bad faith or otherwise failed to mitigate its damages, the court grants summary judgment in favor of Zurich on its breach of contract claim against Ascent and Knowlton.

### 3. Specific Performance

Zurich also moves for summary judgment against Ascent and Knowlton on its claim for specific performance. The 2017 and 2019 GIAs specify that Zurich has a right to specific performance[157] and requires indemnitors to "promptly deposit with Surety, on demand, an amount of money that Surety determines is sufficient to fund any liability or Loss."[158] Zurich asks to be placed in funds in the amount of $3,972,135.43 as collateral for the surety's anticipated future losses, an amount that is comprised of $2,839,319.58 for the Sugarmont interim arbitration award and $1,132,815.85 for potential losses on pending payment bond claims.[159] Defendants have not contested the amount of the arbitration award or provided specific objections to the amount of payment bond claims.[160]

Zurich has not, however, provided documentation of these payment bond claims. The court recognizes that anticipated future losses at the time of the briefing may have now converted

---

[155] *See Devs. Sur. & Indem. Co. v. Network Elec., Inc.*, No. 2:12-cv-00289, 2014 WL 3640748, at *5 (D. Utah July 23, 2014), *aff'd sub nom. Devs. Sur. & Indem. Co. v. Barlow*, 628 F. App'x 980 (10th Cir. 2015) (unpublished).
[156] *Ins. Co. of W.*, 2013 WL 3873227, at *2.
[157] ECF No. 337-10 at ¶ 16.
[158] *Id.* ¶ 4.
[159] ECF No. 337 at 37–38.
[160] Defendants do make the conclusory statement that "[o]ne with unclean hands is not entitled to equitable remedies." ECF No. 388 at 48. But they offer no material explanation or application of the doctrine to the record.

into documented past losses, as Zurich's losses may have continued to accumulate since it filed its amended motion for summary judgment. There may also now be a final ruling on the Sugarmont arbitration award, which had been appealed at the time the summary judgment motions were filed.

The court therefore grants Zurich's motion for summary judgment against Ascent and Knowlton on its specific performance claim but reserves judgment on the amount of anticipated future damages. The court orders Zurich to submit an updated control account, provide a report on the status of the Sugarmont arbitration, and to supply documentation of any payment bonds which expose the surety to potential future liability.

### 4.  Remaining Claims

Ascent moves for summary judgment on Zurich's second, third, fourth, and fifth claims. Zurich stipulates to the dismissal of its fourth cause of action for quia timet.[161] Regarding the third cause of action for specific performance, the court has granted summary judgment in favor of Zurich.[162] Zurich's remaining causes of action, for common law indemnity and unjust enrichment, are alternative theories of liability should Zurich not obtain judgment under the contract. These claims are moot because the court grants summary judgment in favor of Zurich on its claims for indemnification and specific performance.

Ascent and Knowlton also ask for summary judgment on a number of discrete issues, such as a declaration that Zurich has a duty to use reasonable care with collateral. A ruling on these issues would not dispose of any claims or counterclaims and are therefore inappropriate

---

[161] ECF No. 387 at 30.
[162] The court previously denied granting Zurich specific performance, but only in the context of Zurich's request for a specific injunction. *See* ECF No. 75.

matters for summary judgment.[163] As a result, the court denies both Knowlton's and Ascent's motions for summary judgment.

### 5. Motions to Exclude Expert Testimony

Zurich moves to exclude the expert report of Derk Rasmussen and the testimony of non-retained experts Brad Knowlton and Scott Rasmuson.[164] In turn, Ascent and Knowlton jointly move to exclude the expert testimony of Jack Nicholson and Lin Heath.[165] Because the court finds that summary judgment in favor of Zurich is warranted, these motions are moot. Nevertheless, the court has carefully considered whether anything in Rasmussen's expert report should preclude summary judgment in favor of Zurich and finds that his report does not raise a genuine issue of material fact. Rasmussen's report is based on a valuation of Ascent as of December 31, 2018,[166] which is several months before the Sugarmont project grew contentious and over a year before Ascent defaulted on many of its other projects. The court therefore finds that Rasmussen's valuation is not probative. Furthermore, Rasmussen estimates damages based on the assumption that Zurich's actions harmed Ascent[167]—but, as discussed above, Ascent has not provided any evidence by which a reasonable jury could find in Ascent's favor on this issue.

Accordingly, the court terminates the motions as moot.

---

[163] *See Carbajal v. Lincoln Benefit Life Co.*, No. 06-cv-00884, 2007 WL 2221147, at *3 (D. Colo. July 31, 2007) ("[A] party is not entitled to partial summary judgment if the judgment would not be dispositive of the claim." (citation omitted)).
[164] ECF Nos. 327–28.
[165] ECF Nos. 320–21.
[166] Expert Report of Derk Rasmussen, ECF No. 327-1 at 28.
[167] *Id.* at 14–19.

### B. The Dispute between Zurich and Swenson

In its motion for summary judgment against Ascent and Knowlton, Zurich also moves for summary judgment against Swenson on its first and third claims. Zurich acknowledges that Swenson only signed the two 2017 GIAs for the Sugarmont and SGM projects, and therefore only seeks judgment against Swenson for the losses associated with those projects.

Swenson does not join in Ascent and Knowlton's arguments about Zurich's bad faith or the existence of a conspiracy. Instead, she argues that the GIAs are not enforceable against her because she signed them under duress and as a result of fraud. According to Swenson, she signed the GIAs during a period after she informed him that she wanted a divorce.[168] She alleges that Knowlton repeatedly threatened to harm her.[169] In early June 2017, Swenson states that Knowlton arrived at their home enraged and demanded that she sign a signature page while threatening her life.[170] The notary, Natasha McClure, states that she was not present and believes Knowlton later directed her to notarize the document.[171]

As for the second GIA, Swenson alleges that her son Brandt (at the direction of Knowlton) told her to sign and notarize a new signature page because the signature page she had previously signed was not notarized.[172] She therefore argues that the GIAs are unenforceable against her because she signed the first GIA under duress and the second GIA under fraudulent pretenses.

---

[168] Decl. Shondell Swenson, ECF No. 359-2 at ¶¶ 46–47.
[169] *Id.* at ¶ 50.
[170] *Id.* at ¶¶ 67–72; Dep. Shondell Swenson, ECF No. 359-5 at 87:16–88:4.
[171] Decl. Natasha McClure, ECF No. 359-15 at ¶¶ 7–8, 12–15.
[172] ECF No. 359-5 at 98:12–100:10.

Despite these disturbing allegations, Swenson's defense lacks any involvement on the part of Zurich. Swenson does not dispute that she signed a document (twice) and does not accuse Zurich of being the party that threatened or tricked her. Swenson appears to suggest that Zurich or its agent[173] should have overseen the signing process directly to ensure the contract was read, understood, and properly executed. Under this theory, an innocent third party[174] transacting at arm's length or, for that matter, a court, would not be able to rely on a signed, witnessed, and notarized contract without questioning every aspect of its formation.

Utah law does not require such an exacting standard. Under Utah law, duress exists when "a party's manifestation of assent is induced by an improper threat *by the other party* that leaves the victim no reasonable alternative."[175] As a result, "two elements must be shown to exist in order to prove duress. First, there must be some improper threat made *by the defendant*. Second, that threat must leave the victim/plaintiff with no reasonable alternative but to consent to the contract."[176] In *Andreini*, the Utah Supreme Court "explicitly adopt[ed] the legal standards of duress set forth in sections 175 and 176 of the Restatement (Second) of Contracts."[177] In turn, the Restatement states that "[i]f a party's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the

---

[173] The parties disagree about whether Marsh, the insurance broker, was Zurich's agent. The court finds the dispute immaterial but agrees that the evidence demonstrates that *Ascent* paid Marsh commissions for brokering the bonds and that therefore Marsh was not Zurich's agent for the purposes of securing surety bonds. Zurich's Reply to Swenson's Resp., ECF No. 381 at 7–8; *see also* Dep. Jeffrey Strassner, ECF No. 381-2 at 54:20–55:1 (statement by Marsh's 30(b)(6) deponent that Ascent was Marsh's client).

[174] Swenson claims that Zurich is not innocent because it failed to take any action after finding out that Knowlton and Swenson were divorcing. It is unclear what action Swenson believes Zurich should have taken.

[175] *Andreini v. Hultgren*, 860 P.2d 916, 921 (Utah 1993) (quoting Restatement (Second) of Contracts § 175(1) (1979)) (emphasis added).

[176] *Boud v. SDNCO, Inc.*, 2002 UT 83, ¶ 23, 54 P.3d 1131.

[177] *Andreini*, 860 P.2d at 921.

transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction."[178]

Under Swenson's alleged facts, the court finds no evidence that Zurich had reason to know of the duress. Zurich relied on Swenson's signature and gave value in the form of issuing bonds on the Sugarmont project. Accordingly, the court finds that Swenson is liable to Zurich under the 2017 GIA for the Sugarmont project.

Swenson's claim that the 2017 GIA for the SGM project is voidable because of fraud fails for similar reasons. The Restatement (Second) of Contracts states:

> If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.[179]

There are no facts that suggest Zurich knew of the alleged fraudulent misrepresentation. Moreover, Zurich relied on Swenson's signature and gave value by issuing the bonds for the SGM project. Although Zurich issued the bonds for the SGM project before receiving Swenson's signature, the court finds there is no genuine issue that the bonds were needed urgently for project financing and were released only with the understanding that Zurich "would get Shondell's signature at a later date."[180] The GIA explicitly states that Swenson is bound to "the obligations in this Agreement, whether incurred before or after the execution of this Agreement . . . ."[181]

---

[178] Restatement (Second) of Contracts § 175(2).
[179] *Id.* § 164(2).
[180] Dep. Benjamin Holicky, ECF No. 381-4 at 104:1–13.
[181] Errata to Zurich's Mot. for Summ. J., ECF No. 367-1 at ¶ 5. It is true that Zurich originally attached a version of the 2017 GIA for the SGM project without Swenson's signature to its motion for summary judgment. *See* ECF No.

Even if the 2017 GIAs were voidable, Zurich points out that Swenson has never objected to her status as an indemnitor before this litigation. During the divorce proceedings with Knowlton, for instance, Swenson did not argue that the GIAs were unenforceable against her even though there were questions about how Zurich's demand for indemnity against both Knowlton and Swenson would affect the marital estate.[182]

Swenson may have causes of action against Knowlton, her son Brandt, or even McClure, but she cannot claim that either contract is voidable against Zurich. Therefore, and for the reasons discussed above, the court grants summary judgment in favor of Zurich and against Swenson on Zurich's first and third claims for indemnification and specific performance as those claims pertain to Zurich's losses under the 2017 GIAs.

Zurich has moved to exclude the expert testimony of Dr. Kyle Hancock.[183] Dr. Hancock's expert report describes how Swenson may have responded under duress caused by Knowlton but does not create a genuine issue about whether Swenson is liable to Zurich under the GIAs. Because the court finds summary judgment in favor of Zurich is warranted, it terminates this motion as moot.

## C.  The Dispute between Ascent and Dallas

Dallas Knowlton moves for summary judgment on the seven third-party claims asserted against him by Ascent.[184] Ascent, in turn, moves for partial summary judgment and asks the court to declare that Dallas owed Ascent a fiduciary duty.[185]

---

337-6. The court finds this omission immaterial as it later filed the correct contract and there is no dispute that Zurich issued the bonds on the assumption that Swenson would sign the contract later.

[182] *See* Notice of Suppl. Auth., ECF No. 410 at 2–3.

[183] Mot. to Exclude Expert Testimony of Dr. Kyle Hancock, ECF No. 325.

[184] ECF No. 332.

[185] ECF No. 334.

Dallas asserts that although he received the title of Vice President of Operations from July 2019 to February 2020,[186] he was never aware of any additional obligations or duties that came with this title.[187] He never attended any officer or director meetings, and Ascent never filed an update to Utah's Division of Corporations listing him as an officer.[188] Under Utah law, corporate officers "may be appointed by the board of directors or in any other manner as the board of directors or bylaws provide."[189] Ascent's bylaws state: "The officers of the Corporation are to be elected by the Board of Directors at the first meeting of the Board of Directors held after each annual meeting of the shareholders . . . [or] as soon thereafter as convenient."[190]

Ascent has not responded with any evidence to show that Dallas was a corporate officer. There is no record of a Board of Directors meeting in which this vote was taken, and documents filed with the state list only Brad Knowlton, Lauren Knowlton, and previously Scott Johansen as registered principals.[191] In contrast, Dallas points to a Request for Admission that reads: "Admit that Dallas was an employee of Ascent and was not a shareholder nor listed on any state filings as an officer."[192] Ascent's response was: "Admit."[193]

Ascent has not raised a genuine issue about whether Dallas owed Ascent a fiduciary duty because Ascent has not established that Dallas was a director or an officer of the company. As a result, the general standards of corporate conduct listed under Utah Code Ann. § 16-10a-840 are inapplicable to Dallas.

---

[186] Dallas's Resp. to Ascent's Mot. for Partial Summ. J., ECF No. 365 at 2.
[187] Aff. Dallas Knowlton, ECF No. 365-10 at ¶ 12.
[188] Id. at ¶¶ 9–10.
[189] Utah Code Ann. § 16-10a-830 (West 2023).
[190] Bylaws, ECF No. 365-2 at 8.
[191] Registration & Summ. of Online Changes (Utah Dep't of Commerce), ECF No. 365-9.
[192] Resps. to First Set of Written Discovery Reqs., ECF No. 332-2 at 14, ¶ 15.
[193] Id.

Furthermore, Ascent did not meaningfully respond to Dallas's motion for summary judgment.[194] Ascent's response includes a Statement of Additional Facts that pertains to Swenson, not Dallas.[195] And the single page of argument is limited to assertions that Dallas failed to create an appendix for his two exhibits, that Ascent has "disclosed extensive facts in support of its claims in the attached exhibits" (with no specific examples or citations to those exhibits),[196] and that Dallas's declaration is a "'smoking gun' of verifiable boots-on-the-ground facts confirming his fraudulently concealed actions in breach of his fiduciary duty[.]"[197]

The court has already found that Ascent did not submit evidence sufficient to create a genuine issue that Zurich acted in bad faith. Dallas supports that finding in his affidavit, and Ascent fails to respond with conflicting evidence. Dallas avers that "Zurich did not play any role in the creation of Pfeifferhorn Construction," that neither Nicholson nor Zurich promised Dallas work if Pfeifferhorn obtained a general contractor's license, that Zurich did not pay for Pfeifferhorn's contractor's license, that Pfeifferhorn was never hired by Zurich to complete Ascent projects, that Dallas did not work for Zurich or Nicholson until he was no longer an employee at Ascent, and that he received only $3,961.65 for consulting services, mostly related to helping Zurich organize project schedules for Ascent's terminated projects.[198] Finally, Dallas states that Zurich never directed him to recruit Ascent employees to leave Ascent, to encourage subcontractors to file bond claims, or to interfere with the contracts between Ascent and project

---

[194] *See* Ascent's Mem. in Opp'n, ECF No. 361.
[195] *Id.* at 7–8.
[196] *Id.* at 7. The exhibits are incorrectly filed on the docket as freestanding exhibits not attached to any document. *See* ECF No. 363.
[197] ECF No. 361 at 10.
[198] ECF No. 365-10 at ¶¶ 21–22, 25, 29–32.

owners.[199] No reasonable jury could find that a conspiracy existed between Zurich and Dallas. Additionally, Dallas argues that Ascent has not proved that it suffered damages from Dallas's actions. The court agrees and has discussed above Ascent's failure to establish that the performance bond claims, payment bond claims, and eventual defaults were the result of anyone else's actions.

Based on Dallas's uncontroverted evidence, Ascent's failure to meaningfully respond, and the lack of evidence that Dallas was ever a corporate officer or director of Ascent, the court finds that summary judgment is warranted in favor of Dallas on all the third-party claims asserted against him.

### D. The Dispute between Ascent/Knowlton and Swenson

Swenson moves for summary judgment on the five crossclaims asserted against her by Ascent and Knowlton, citing Ascent's failure to prove damages.[200] Ascent and Knowlton did not meaningfully oppose her motion, instead submitting the same document filed in opposition to Dallas's motion for summary judgment.[201] For the reasons discussed above, the court agrees that Ascent and Knowlton's damages are speculative. Moreover, Ascent and Knowlton have failed to provide evidence by which a reasonable factfinder could conclude that Swenson was involved in a conspiracy with Zurich, Dallas, or any project owners to sink Ascent's projects.

Ascent and Knowlton have separately moved to exclude the expert testimony of Dr. Kyle Hancock.[202] Because the court finds that summary judgment in favor of Swenson is warranted, the court terminates this motion as moot.

---

[199] *Id.* at ¶¶ 33–41.
[200] ECF No. 333.
[201] *Compare* ECF No. 361, *with* Ascent's Mem. in Opp'n, ECF No. 362.
[202] ECF No. 319.

### E.  Remaining Claims

There are three remaining counterclaims that Ascent and Knowlton have asserted against Zurich: a claim for the breach of the covenant of good faith and fair dealing, a claim for civil conspiracy, and a claim of aiding and abetting Dallas's breach of a fiduciary duty.[203] Although Zurich has not moved for summary judgment on these counterclaims, the court has addressed the issue of good faith and fair dealing and found that Defendants raise no genuine issue that Zurich acted in bad faith. Accordingly, no reasonable jury could find in Defendants' favor on this counterclaim. Furthermore, Ascent has not established that Dallas was a corporate officer and the court has therefore found that Dallas did not owe the company a fiduciary duty. Because the counterclaims for civil conspiracy and aiding and abetting are both premised on Dallas's breach,[204] these counterclaims also fail as a matter of law.

Finally, Swenson has asserted two crossclaims against Knowlton for indemnification and breach of fiduciary duties. Neither party has moved for summary judgment on these claims and so they remain pending. Nevertheless, the court has no original jurisdiction over the claims of these non-diverse parties and declines to exercise supplemental jurisdiction, as the claims are closely related to Knowlton and Swenson's divorce decree in state court. Accordingly, the court dismisses without prejudice these claims.[205]

---

[203] *See* ECF No. 249 at 6–8, 12–15.

[204] *See id.* at 13 (holding that the claim for aiding and abetting breach of fiduciary duty was "sufficient to sustain Ascent's claim for civil conspiracy").

[205] "Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if 'the district court has dismissed all claims over which it has original jurisdiction.'" *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting § 1367(c)(3)). And "the court . . . usually should" in such a case. *Smith v. City of Enid By & Through Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998).

**F. Conclusion**

Granting summary judgment to Zurich on its first and third claims, the court finds that the parties are liable to Zurich as follows: Ascent, Knowlton, and Swenson are jointly and severally liable under the 2017 GIAs (for the Sugarmont and SGM projects) in the amount of $7,119,450.50. Additionally, Ascent and Knowlton are jointly and severally liable under the 2019 GIA for the remaining losses of $19,014,568.20.[206] The amount of the court's judgment may be adjusted after Zurich submits an updated control account showing additional losses and any additional contract receipts. In addition, Zurich must show cause why the settlement with the Johansens, who were jointly and severally liable on the 2017 GIAs, should not be used to offset the liability of Ascent, Knowlton, and Swenson under the 2017 GIAs.

The court declines to enter judgment on Zurich's claim for specific performance until Zurich provides additional documentation about the outstanding payment bond claims and updates the court about the status of the Sugarmont arbitration appeal.

Finally, Zurich has requested an award of attorney's fees and costs against Ascent and Knowlton in the amount of $4,190,673.04. Zurich supports this amount with an affidavit from its counsel and a list of invoices billed by Eaves.[207] While Zurich is entitled to attorney's fees and costs, the court finds that the submitted list of invoices is not specific about the number of hours worked, the work performed, and the hourly rates directly associated with that work. The court grants Zurich leave to refile its request with an updated calculation of costs and fees supported

---

[206] This figure represents the total amount of losses claimed by Zurich ($26,134,018.70) minus the losses attributable to the Sugarmont and SGM projects ($7,119,450.50).
[207] Decl. Connor L. Cantrell, ECF No. 337-28; Summ. of Atty's Fees, ECF No. 337-30.

by billing invoices, pro forma, or their equivalent documenting the fees and costs. The court also grants Zurich leave to file a motion for an award of costs and fees against Swenson.

## ORDER

For the foregoing reasons, the court orders as follows:

1.      Zurich's Renewed Motion for Summary Judgment[208] on its first and third claims against Ascent, Knowlton, and Swenson is GRANTED.

2.      Ascent's Motion for Summary Judgment[209] is DENIED.

3.      Knowlton's Motion for Summary Judgment[210] is DENIED.

4.      Dallas's Motion for Summary Judgment[211] is GRANTED.

5.      Ascent's Motion for Partial Summary Judgment Re: Fiduciary Duties[212] is DENIED.

6.      Swenson's Motion for Summary Judgment[213] is GRANTED.

7.      The following motions are TERMINATED AS MOOT: Motion to Exclude Zurich's Expert Jack Nicholson;[214] Motion to Exclude Zurich's Expert Lin Heath;[215] Zurich's Motion to Exclude Testimony of Derk Rasmussen;[216] Zurich's Motion to Exclude Testimony of

---

[208] ECF No. 337.
[209] ECF No. 348.
[210] ECF No. 347.
[211] ECF No. 332.
[212] ECF No. 334.
[213] ECF No. 333.
[214] ECF No. 320.
[215] ECF No. 321.
[216] ECF No. 328.

Brad Knowlton and Scott Rasmuson;[217] Zurich's Motion to Exclude Testimony of Dr. Kyle

Hancock;[218] and Ascent's Motion to Exclude Testimony of Dr. Kyle Hancock.[219]

    8.    The court enters judgment in favor of Zurich and against Ascent and Knowlton,

jointly and severally, in the amount of $19,014,568.20.

    9.    The court enters judgment in favor of Zurich and against Ascent, Knowlton, and

Swenson, jointly and severally, in the amount of $7,119,450.50.

    10.    The court grants Zurich leave to refile within thirty days its request for attorney's

fees and costs against Ascent and Knowlton.

    11.    The court grants Zurich leave to file within thirty days a request for attorney's

fees and costs against Swenson.

    12.    Within thirty days of the date of this order, the court orders Zurich to file: (1) an

updated control account including any and all contract receipts not reflected in the Eaves

Declaration (e.g., from the APA Auditorium project and any others) and additional payments it

has made since it filed for summary judgment; (2) an update about whether the appeal of the

Sugarmont arbitration award has been finalized; (3) the amount of money it currently seeks on its

specific performance claim with accompanying documentation demonstrating these potential

future losses; and (4) a response showing cause why the settlement with the Johansens should

not be used to offset the judgment of $7,119,450.50 against Ascent, Knowlton, and Swenson.

    13.    The defendants may file objections to Zurich's report within fourteen days of the

receipt of that report. Zurich may file a reply within fourteen days of said objections, if any.

---

[217] ECF No. 327.
[218] ECF No. 325.
[219] ECF No. 319.

14.     The court will enter judgment separately. The court anticipates entering an

amended judgment after completion of the supplemental briefing ordered herein.


Signed September 28, 2023.

BY THE COURT

_____
David Barlow
United States District Judge